Aston **BARTHOLOMEW**, Plaintiff-Appellee,

v.

**UNIVERSE TANKSHIPS, INC.**, Defendant-Appellant.

**No. 22, Docket 25011.**

United States Court of Appeals Second Circuit.

Argued Oct. 8, 1958.

Decided Jan. 9, 1959.

Morton M. Shreck and Nathan L. Berke, New York City, for plaintiff-appellee.

Victor S. Cichanowicz, New York City (Cunningham & Cichanowicz, New York City, on the brief), for defendant-appellant.

Before CLARK, Chief Judge, and MEDINA and LUMBARD, Circuit Judges.

MEDINA, Circuit Judge.

Aston Bartholomew, a citizen of the British West Indies, was a seaman on board the Ulysses, a vessel owned and operated by appellant, a Liberian corporation, and flying the flag of Liberia. On April 15, 1952, as the vessel was proceeding within the three-mile limit, and hence in the territorial waters of the United States, Bartholomew was assaulted by a fellow member of the crew who had previously attacked other seamen. The complaint alleged a claim based upon the Jones Act, another based upon alleged unseaworthiness under the Maritime Law and a third claim for maintenance and cure, also under the Maritime Law. Over the objection of appellant,

the trial judge held: that the circumstances disclosed by the evidence made the Jones Act applicable; that, although the trial was had on the civil side of the Court to a judge and jury, and not in admiralty, there was pendent jurisdiction over the maritime cause for unseaworthiness of the vessel; and he submitted both the Jones Act claim and the maritime cause for unseaworthiness to the jury, reserving the maintenance and cure maritime cause for decision by himself as a "judge in admiralty," his determination to be based upon the evidence adduced at the trial and such further proofs as the parties might wish to offer later. The jury found for Bartholomew on each of the claims submitted to it, fixing the damages in the sum of $24,-600, or $25,000, less the $400 paid upon the signing of a release by Bartholomew which the jury disregarded as not binding on him. The maintenance and cure claim is held in abeyance pending the outcome of this appeal.

Appellant contends: that the court below improperly found the Jones Act applicable; that in any event the maritime cause should not have been submitted to the jury; that it was error to refuse to give certain instructions to the jury as requested by appellant; and that the motion to set aside the verdict and grant a new trial should have been granted because the jurors allegedly compromised their views on the subject of damages. We shall discuss *seriatim* these points and the evidence and the portions of the record relevant to each.

### Applicability of the Jones Act

Did the District Court err in holding that Bartholomew had a right to invoke the Jones Act against his employer, a Liberian corporation? In Lauritzen v. Larsen, 1953, 345 U.S. 571, at page 582, 73 S.Ct. 921, at page 928, 97 L.Ed. 1254, the Supreme Court tells us that the answer is to be found by "ascertaining and valuing points of contact between the transaction and the states or governments whose competing laws are involved," and by "weighing * * * the significance of one or more connecting

factors between the shipping transaction regulated and the national interest served by the assertion of authority," such as the place of the wrongful act, the law of the flag, the allegiance or domicile of the claimant, the allegiance of the shipowner, the place of contract between the parties, the inaccessibility of the foreign forum and the law of the forum.

A study of the numerous adjudicated Jones Act cases reveals not only the vagueness inherent in the general and undefined direction in Lauritzen for the "valuing" and "weighing" of the various facts or groups of facts that are said to be "points of contact" between the transaction and the states whose competing laws are involved, but also a lack of any common principle of decision or method of approach to the problem. Sometimes the courts seem to be employing choice of law techniques, and not infrequently the result arrived at seems to be based on mere dialectic manipulation or guesswork. All this, however, is to be expected as new law develops in a new field. This substantial background of judicial consideration of a great variety of combinations of relevant factors in cases where application of the Jones Act is asserted on the one hand and denied on the other makes it possible for us to undertake a restatement of the method of approach and the principles to be applied.

To begin with, as pointed out in Lauritzen, 345 U.S. at page 578, 73 S.Ct. at page 926, "we are simply dealing with a problem of statutory construction." For this reason traditional choice of law techniques may be more misleading than helpful.

In the second place, certain possible interpretations of the Jones Act have already been rejected, and their elimination simplifies the problem. For example, when the question was first presented it might have been held that in the enactment of the Jones Act the Congress intended to exercise the full measure of its power over the subject of the legislation, in which event any contact between the transaction and the United States would have been sufficient to war-

rant its application. But a contrary view prevailed. See The Paula, 2 Cir., 1937, 91 F.2d 1001, certiorari denied sub nom., Peters v. Lauritzen, 302 U.S. 750, 58 S.Ct. 270, 82 L.Ed. 580; O'Neill v. Cunard White Star, 2 Cir., 1947, 160 F.2d 446, certiorari denied 332 U.S. 773, 68 S.Ct. 56, 92 L.Ed. 358. Such inclusiveness was not read into the statute, since it was assumed that the Congress intended the Jones Act to be given a construction in consonance with international maritime law. This meant that not every contact, no matter how ephemeral or fortuitous it might be, would be deemed a basis for applying American law, that is to say the Jones Act. Instead, as commented on in Lauritzen (345 U.S. at page 582, 73 S.Ct. at page 928) "the necessity of mutual forbearance" to avoid international retaliation, and the desire to avoid changing and variant regulations aboard ship, have been stressed. Moreover, the courts might have so construed the Jones Act as to make some particular factor indispensable; but they did not. In other words, even if it appeared that a single special factor of obvious significance was lacking the Jones Act has been held to be applicable despite the absence of such a factor.

Thus the Jones Act has often been applied although the "flag of the ship" was foreign. E.g., Uravic v. F. Jarka Co., 1931, 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312; Gerradin v. United Fruit Co., 2 Cir., 1932, 60 F.2d 927, certiorari denied 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556; Gambera v. Bergoty, 2 Cir., 1942, 132 F.2d 414, certiorari denied 1943, 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699. Ownership of the vessel by American citizens was also lacking in the Uravic and Gambera cases.

That the tort need not occur in domestic waters was clearly shown in Panama R. Co. v. Johnson, 1923, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748; Carroll v. United States, 2 Cir., 1943, 133 F.2d 690; Wenzler v. Robin Line S.S. Co., D.C.W.D.

Wash.1921, 277 F. 812. In the Carroll case, supra, and in Torgersen v. Hutton, 2nd Dept. 1934, 243 App.Div. 31, 276 N.Y.S. 348, affirmed 1935, 267 N.Y. 535, 196 N.E. 566, certiorari denied, 1935, 296 U.S. 602, 56 S.Ct. 118, 80 L.Ed. 426, the seaman was neither a citizen nor domiciliary of the United States.

Other contacts such as the place of contract and the origin and destination of the vessel have probably never even been suggested as indispensable.

Nor can a "center of gravity" or "place of most vital connection" approach properly rationalize the decided cases.

Thus in the Uravic and Gambera cases though the flag of the ship and the owners of the vessel were foreign, the American citizenship or domicile of the seaman and the occurrence of the tort in the waters of the United States still led the courts to apply the Jones Act. Yet could anyone doubt that if the ship flew the American flag, without more, the Jones Act would apply? See Lauritzen v. Larsen, supra; O'Neill v. Cunard White Star, Ltd., 2 Cir., 1947, 160 F.2d 446, certiorari denied, 332 U.S. 773, 68 S.Ct. 56, 92 L.Ed. 358; Sonnesen v. Panama Transport Co., 1948, 298 N.Y. 262, 82 N.E.2d 569, certiorari denied, 1949, 337 U.S. 919, 69 S.Ct. 1157, 93 L.Ed. 1729. In this very case the "law of the flag" controlled the determination of the maritime claim. And in Carroll v. United States, 2 Cir., 1943, 133 F.2d 690, and Bobolakis v. Compania Panamena Maritima San Gerassimo, S. A., D.C.S.D. N.Y.1958, 168 F.Supp. 236, American ownership alone was deemed sufficient to apply the Jones Act.[1] It is apparent then that the contacts considered most vital in one case are not necessarily of controlling importance in another.

Hence it must be said that in a particular case something between minimal and preponderant contacts is necessary if the Jones Act is to be applied. Thus we conclude that the test is that "substantial" contacts are necessary. And while as indicated supra one contact

---

1. But see Footnote 4 infra.

such as the fact that the vessel flies the American flag may alone be sufficient, this is no more than to say that in such a case the contact is so obviously substantial as to render unnecessary a further probing into the facts.

Some of the advantages of this simple formula are that it states a rational method of ascertaining the congressional intent, and that in its application there is no occasion to consider and "weigh" the contacts that do not exist, nor to go through any process of balancing one set of facts that are present against another set of facts that are absent, without any sure guide as to how the balancing is to be done. Accordingly, the decisional process of arriving at a conclusion on the subject of the application of the Jones Act involves the ascertainment of the facts or groups of facts which constitute contacts between the transaction involved in the case and the United States, and then deciding whether or not they are substantial. Thus each factor is to be "weighed" and "evaluated" only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality. Moreover, each factor, or contact, or group of facts must be tested in the light of the underlying objective, which is to effectuate the liberal purposes of the Jones Act. We shall now proceed to apply these principles to the case before us.

The basic facts may be briefly stated. The assault took place in the territorial waters of the United States. It matters not that the evidence was conflicting; the finding of the trial judge on this point is certainly not clearly erroneous.

Bartholomew was brought to the United States in 1950 by appellant and taken to Baltimore where he first signed on as a seaman on one of appellant's vessels.

Since then he has lived in Brooklyn, New York, where all his personal effects have been located; he made two voyages aboard vessels of appellant other than the Ulysses, worked for Macy's and another concern for about a year, and maintained a bank account in Brooklyn. About three months after the assault, Bartholomew left the United States and proceeded to Puerto Rico, where he remained for two weeks for the sole purpose of obtaining a visa so that he could be eligible to apply for United States citizenship. Promptly upon his return to the United States he signed the usual declaration of intention.

Appellant is a Liberian corporation and the Ulysses flew the Liberian flag. But all the stock of the Liberian corporation is held by a Panamanian corporation, and all the stock of the Panamanian corporation is owned by citizens of the United States. All the officers of appellant are American citizens, its principal place of business is in New York City, and it maintains an office in Liberia as a mere formality to comply with the Liberian statutory requirements.

The articles for the voyage on the Ulysses which was in progress at the time of the assault were signed by Bartholomew in Baltimore. There is no provision in these articles on the subject of what law is to govern in the event of an accident or other occurrence resulting in personal injuries or damage to a seaman. The voyage began in Baltimore and ended in Philadelphia.

■ We start with the fact that the assault occurred in the territorial waters of the United States. This is undoubtedly a factor of significance, see Lauritzen, 345 U.S. at page 583, 73 S.Ct. at page 928. We have no occasion here to determine whether or not the presence of this factor alone would suffice to make the Jones Act applicable.[2]

**2.** Several cases have found the Jones Act inapplicable under such circumstances. E. g., The Paula, 2 Cir., 1937, 91 F.2d 1001, certiorari denied sub nom., Peters v. Lauritzen, 302 U.S. 750, 58 S.Ct. 270,

82 L.Ed. 580; Hansen v. A.S.D., S.S. V. Endborg, D.C.S.D.N.Y.1957, 155 F.Supp. 387; Nakken v. Fearnley & Eger, D.C. S.D.N.Y.1955, 137 F.Supp. 288; Samad v. The Etivebank, D.C.E.D.Va.1955, 134

Although appellant contends otherwise, the practice in this type of case of looking through the façade of foreign registration and incorporation to the American ownership behind it is now well established. Gerradin v. United Fruit Co., 2 Cir., 1932, 60 F.2d 927, certiorari denied 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556; Carroll v. United States, 2 Cir., 1943, 133 F.2d 690; Zielinski v. Empresa Hondurena de Vapores, D.C.S.D.N.Y.1953, 113 F.Supp. 93; Torgersen v. Hutton, 2nd Dept. 1934, 243 App.Div. 31, 276 N.Y.S. 348, affirmed, 1935, 267 N.Y. 535, 196 N.E. 566, certiorari denied, 1935, 296 U.S. 602, 56 S.Ct. 118, 80 L.Ed. 426. This is essential unless the purposes of the Jones Act are to be frustrated by American shipowners intent upon evading their obligations under the law by the simple expedient of incorporating in a foreign country and registering their vessels under a foreign flag. See Lauritzen, 345 U.S. at page 587, 73 S.Ct. at page 930. In the case now before us appellant has taken the trouble to insert an additional nominal foreign corporation between the flag and the true beneficial ownership of the vessel. But we have little difficulty in brushing all this aside when considering the applicability *vel non* of the Jones Act. Complicating the mechanics of evasive schemes cannot serve to make them more effective. What we now do is not to disregard the corporate entity to impose liability on the stockholders, but rather to consider a foreign corporation as if it were an American corporation pursuant to the liberal policies of a regulatory act.[3] See Zielinski v. Empresa Hondurena de Vapores, supra, 113 F.Supp. at page 95.

We also think the evidence overwhelmingly establishes that Bartholomew had sufficient presence and intent to be deemed a resident and domiciliary of the United States for the purpose of determining whether or not the Jones Act is applicable. Appellant, however, urges us to rule that the lack of a legal entry for immigration and naturalization purposes precludes us from considering Bartholomew as a "permanent inhabitant" (see Lauritzen, 345 U.S. at page 586, 73 S.Ct. at page 930) in connection with the problem of statutory construction now under consideration. Several cases are cited for this proposition but all of them arose in matters involving various provisions of the statutes affecting immigration and naturalization. E.g., United States ex rel. Bartsch v. Watkins, 2 Cir., 1949, 175 F.2d 245; Del Castillo v. Carr, 9 Cir., 1938, 100 F.2d 338; Taguchi v. Carr, 9 Cir., 1932, 62 F.2d 307; Hurst v. Nagle, 9 Cir., 1929, 30 F.2d 346, certiorari denied 279 U.S. 861, 49 S.Ct. 419, 73 L.Ed. 1001. That there is no basis for analogizing plaintiff's status under strict immigration laws, designed to keep undesirable aliens out of this country, to his status under a broadly worded, liberally construed statute designed for the protection of seamen almost goes without saying. Barber v. Varleta, 9 Cir., 1952, 199 F.2d 419, another immigration case, goes more to the point. There an alien seaman who had entered this country illegally, but who had lived here a number of years, was deemed to have "actually resided" here for the purposes of the Philippine Trade Act, 22 U.S.C.A. § 1251 et seq., and hence was found to be entitled to the benefits of a non-quota immigrant. Similarly, there can be little doubt that for Jones Act purposes plaintiff's actual "resident" status is to be considered apart from the technical legality of such status.

■ That the factors or contacts just discussed are in the aggregate substan-

F.Supp. 530. In Romero v. International Terminal Operating Co., D.C.S.D.N.Y. 1956, 142 F.Supp. 570, affirmed Per Curiam, 2 Cir., 1957, 244 F.2d 409, this issue was one of the numerous points in contention. The Supreme Court has granted certiorari, 355 U.S. 807, 78 S.Ct. 55, 2 L.Ed.2d 27.

3. It should be unnecessary to add that in treating the foreign incorporation of appellant as if American for Jones Act purpose, we do not pass upon, nor have we considered, the wholly separate question of similar treatment for purposes of jurisdiction under 28 U.S.C. § 1332 (a) (2).

tial is clear beyond peradventure of doubt.[4] No other conclusion is rationally admissible in the light of the decided cases. Uravic v. F. Jarka Co., 1931, 282 U.S. 234, 51 S.Ct. 111, 75 L.Ed. 312; Gerradin v. United Fruit Co., 2 Cir., 1932, 60 F.2d 927, certiorari denied 287 U.S. 642, 53 S.Ct. 92, 77 L.Ed. 556; Gambera v. Bergoty, 2 Cir., 1942, 132 F.2d 414, certiorari denied, 1943, 319 U.S. 742, 63 S.Ct. 1030, 87 L.Ed. 1699; Carroll v. United States, 2 Cir., 1943, 133 F.2d 690; Zielinski v. Empresa Hondurena de Vapores, supra.

It is true that Lauritzen appears to stress the law of the flag as perhaps the most important factor, but we can perceive no indication whatever in Justice Jackson's opinion of an intention to repudiate the earlier cases just cited. And yet little short of the rejection of all of them would permit us to hold the Jones Act inapplicable in the case before us. Indeed, the discussion in Lauritzen does no more than establish the insubstantiality of the contacts present in that case.

Moreover, this is not a matter resting in the discretion of the trial judge, as seems to have been thought to be the case here. The facts either warrant the application of the Jones Act or they do not. Under 28 U.S.C. § 1331, once federal law is found applicable the court's power to adjudicate must be exercised. While at times the impact of intricate questions of state law may require a federal court to stay its hand, Burford v. Sun Oil Co., 1943, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424, and we need not attempt to catalogue other exceptional situations, it is clear that the District Court in the instant case had no discretionary power to refuse to adjudicate the case.

*The Maritime Claims*

Was it error to submit the maritime claim for unseaworthiness to the jury along with the Jones Act claim for negligence?

Preliminarily, it may be well to clear up a possible misconstruction of our decision in Paduano v. Yamashita Kisen Kabushiki Kaisha, 1955, 221 F.2d 615, 619. There we held that the civil side of the District Court had no jurisdiction to try a maritime cause for unseaworthiness "in which the general maritime law is the sole substanive basis for awarding the relief claimed in the complaint."[5] But, as pointed out by Judge Waterman in Troupe v. Chicago, Duluth & Georgian Bay Transit Company, 2 Cir., 1956, 234 F.2d 253, 257, Paduano has significance primarily with respect to the mode of trial. There is always subject matter jurisdiction in admiralty over an unseaworthiness claim. In Paduano we did not transfer the case to the admiralty docket of the District Court, rather than affirm the judgment of dismissal for lack of jurisdiction, simply because no such request was presented to us, and we gave no consideration to the making of such a transfer.

We are now required to decide the question left open in Troupe (see 234 F.2d at page 258), whether, in a case where federal-question jurisdiction on the civil side of the District Court has attached in an action at law under the Jones Act, and a maritime cause for unseaworthiness is also alleged, arising out of the same occurrence, it is proper to try both

4. Indeed, cases such as Mproumeriotis v. Seacrest Shipping Co., D.C.S.D.N.Y.1957, 149 F.Supp. 265, and Argyros v. Polar Compania De Navegacion, Ltda., D.C. S.D.N.Y.1956, 146 F.Supp. 624, holding American ownership alone insufficient to warrant application of the Jones Act must be considered of doubtful validity. In Mproumeriotis and Hansen v. A.S.D., S.S. V. Endborg, D.C.S.D.N.Y.1957, 155 F.Supp. 387; Nakken v. Fearnley & Eger, D.C.S.D.N.Y.1955, 137 F.Supp.

288; Rankin v. Atlantic Maritime Co., D.C.S.D.N.Y.1953, 117 F.Supp. 253, the courts apparently adopted the unsatisfactory procedure of balancing or comparing present with absent factors.

5. Paduano, supra, 221 F.2d at page 619. Accord Jordine v. Walling, 3 Cir., 1950, 185 F.2d 662; Jenkins v. Roderick, D.C. D.Mass.1957, 156 F.Supp. 299, 302. Contra, Doucette v. Vincent, 1 Cir., 1952, 194 F.2d 834.

causes together to a court and jury. In the typical case and in the case before us the basic operative facts are almost but not quite identical; and as a matter of expediency and sound judicial administration it is plainly wasteful of the time of all concerned to require separate trials (see Troupe, at page 258). On the negligence phase of the case Bartholomew was required to prove that the shipowner knew or should have known of a propensity to violence on the part of the seaman who attacked him, whereas the unseaworthiness count depended upon no more than proof that the shipowner had not provided a vessel "sufficient, that is reasonably adequate, in materials, construction, equipment, stores, officers, men and outfit for the trade or service in which the vessel is employed." Doucette v. Vincent, supra, 194 F.2d at pages 837, 838 and cases cited. Knowledge or lack of knowledge of the defect is not material, "the shipowner must at his peril furnish a seaworthy ship." While in the present case the Liberian maritime law was held applicable, the proof showed that the Liberian maritime law and the American maritime law on the point were the same. The thrust of all this with respect to the precise question now under discussion is that separate trials involve the possibility of an application of the doctrines of *res judicata* or collateral estoppel. Such procedural entanglements are, of course, to be avoided in the interest of justice. Thus while Baltimore S.S. Co. v. Phillips, 1927, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069, seems to preclude recovery under the Jones Act if the unseaworthiness issues have been previously decided adversely to the seaman,[6] the converse may not be true,[7] because the seaman might have lost his Jones Act recovery because the trier of the facts decided he had not es-

6. Recovery by the seaman on either claim is deemed mutually exclusive. Pacific S.S. Co. v. Peterson, 1928, 278 U.S. 130, 138, 49 S.Ct. 75, 73 L.Ed. 220.

7. The Supreme Court recently in McAllister v. Magnolia Petroleum Co., 1958, 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272, appears to have assumed that the doctrine of *res judicata* worked both ways. In that case a state was prohibited from applying its shorter statute of limitations to a maritime claim for unseaworthiness on the ground that under Baltimore S.S. Co. v. Phillips, supra, the seaman was compelled to bring both causes of action simultaneously or lose one via *res judicata*. Hence, it was reasoned, shortening the time limitation on the maritime facet of the case adversely affected the three-year period given to seamen by the Congress on their Jones Act claims. However, although all three opinions seemed to regard the point as settled, it was not necessary to find a complete interchangeability of claims for *res judicata* purposes. To demonstrate the adverse effects of applying the state statute of limitations, it would have been sufficient to reaffirm Baltimore S.S. Co. v. Phillips, supra, and hold that a decision on the maritime claim barred the Jones Act claim. And see Troupe v. Chicago, Duluth & Georgian Bay Transit Company, 2 Cir., 1956, 234 F.2d 253, and Balado v. Lykes Brothers S.S. Co., 2 Cir., 1950, 179 F.2d 943, where despite jury verdicts for defendants on the Jones Act claim, the cases were remanded for more clear-cut verdicts on unseaworthiness. See also the comment by Judge Wyzanski in Jenkins v. Roderick, D.C.D. Mass.1957, 156 F.Supp. 299, 300.

It is all very well to say that the advantages of joining Jones Act, unseaworthiness and maintenance and cure claims in the same proceeding is so manifest "that a seaman will rarely forego his right to sue for all three," McAllister, supra, 357 U.S. at page 224, 78 S.Ct. at page 1204; the fact remains, however, that neither the seamen nor their lawyers are always aware of the substantive and procedural rules affecting the rights of the injured seamen, and it is not improbable that suits will hereafter be brought in state or federal courts involving the assertion of only one of the three claims or as many combinations of each of the three as are mathematically possible. Indeed, the number of motions by shipowners for consolidation appearing in the reports of decisions in this field would seem to indicate that at least in some cases the seaman has sought to take two bites of the apple by bringing the action involving the Jones Act claim first, and then later filing his libel in admiralty asserting the maritime claim for unseaworthiness, in the hope that the Jones Act claim could be tried first, in which event, if the seaman lost, he might still prevail on his claim for unseaworthiness.

tablished the requisite notice to the ship-owner of the defect or omission.

As we have concluded that it was proper to try both claims to a jury, it would perhaps suffice to say that we are content to follow the courts that have already given their approval to this procedure.[8] But the question cuts deep; it has not yet been passed upon by the Supreme Court; and we prefer briefly to state the reasons we think support the view we have taken of the matter. Our analysis of the series of theoretical and practical problems involved may serve somewhat to clarify the general subject of the method of trial in a federal District Court of the composite rights of an injured seaman, including his claims under the Jones Act for negligence, under the general maritime law for unseaworthiness and, also under the general maritime law, for maintenance and cure, a subject that has been almost endlessly discussed in the opinions of the courts and by text writers and commentators.[9]

Counsel in the case before us have articulated their argument on the subject of the method of trial in terms of pendent jurisdiction as outlined in Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148. But Hurn v. Oursler, was concerned with the distribution of judicial power between the state and federal courts; the rule was formulated solely for the purpose of preventing piecemeal litigation; and the solution of the type of problem there presented was stated to depend upon the distinction between separate causes of action on the one hand, and separate grounds for a single cause of action, on the other.[10] But in the case before us there is undoubted jurisdiction in the District Court of the entire controversy between the parties. Jurisdiction of no single one of the claims is ancillary to jurisdiction over either or both of the others. On the other hand, as we found in Paduano, the competence of the District Court is divided, for purposes of the mode of trial and for other purposes, into compartments having separate civil, criminal and admiralty powers or competence. But as in the merger of law and equity, all these powers reside in a single District Court. To meet the practical necessities of the problem now before us we find no insuperable difficulty in carrying over the pendent doctrine to this analogous field, by holding that the Jones Act claim carries along with it the maritime claim of unseaworthiness for purposes of a trial, in the civil part of the District Court,[11] of all the issues arising out of both such claims.

The two claims may and usually are set forth as separate counts in a single pleading, or in separate pleadings in sep-

---

8. See Troupe v. Chicago, Duluth & Georgian Bay Transit Company, supra, 234 F.2d at page 258; Doucette v. Vincent, 1 Cir., 1952, 194 F.2d 834, 840, note 5; Jordine v. Walling, 3 Cir., 1950, 185 F.2d 662, 670; Jenkins v. Roderick, D.C.D.Mass.1957, 156 F.Supp. 299; Andersen v. McAllister Lighterage Line, Inc., D.C.E.D.N.Y.1957, 157 F.Supp. 384; cf. McCarthy v. American Eastern Corp., 3 Cir., 1949, 175 F.2d 724, certiorari denied 338 U.S. 868, 70 S.Ct. 144, 94 L.Ed. 532; McAfoos v. Canadian Pacific Steamships, Ltd., 2 Cir., 1957, 243 F. 2d 270, certiorari denied 355 U.S. 823, 78 S.Ct. 32, 2 L.Ed.2d 39. See also Balado v. Lykes Bros. S.S. Co., 2 Cir., 1950, 179 F.2d 943 (both questions submitted to jury without discussion).

9. See cases cited Footnote 8, supra and Gonzales v. United Fruit Co., 2 Cir., 1951, 193 F.2d 479, 480, note 1; Mullen v. Fitz Simons & Connell Dredge & Dock Co., 7 Cir., 1948, 172 F.2d 601, certiorari denied, 1949, 337 U.S. 959, 69 S.Ct. 1534, 93 L.Ed. 1758; Lindquist v. Dilkes, 3 Cir., 1942, 127 F.2d 21; Nolan v. General Seafoods Corp., 1 Cir., 1940, 112 F.2d 515; Stevens v. R. O'Brien & Co., 1 Cir., 1933, 62 F.2d 632. See also 5 Moore, Federal Practice p. 278 (1951) and Supp. p. 17 (1957); 71 Harv.L.Rev. 1359 (1958); 19 G.Wash.L.Rev. 453 (1951); Comment, 57 Yale L.J. 243 (1947).

10. See Hart and Wechsler, The Federal Courts and the Federal System, pp. 802–809 (1953).

11. The Jones Act, 46 U.S.C.A. § 688, reads:
"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an

arate proceedings, and as a complaint in a civil action and a libel *in rem* or *in personam*, or both, in admiralty. Thus the problem we seek to solve involves indirectly calendar, pre-trial and consolidation procedures.

Assuming that the two counts are in a single pleading, as here, or, if in separate proceedings, have been consolidated, that plaintiff has demanded a jury trial, and that the case is called for trial in the civil part of the District Court, it may seem possible to dispose of the negligence and unseaworthiness claims together, with the judge leaving the negligence claim issues of fact to the jury, while at the same time reserving the unseaworthiness claim issues for determination by himself, as Judge Conger did in the case before us with respect to the issues arising out of the claim for maintenance and cure. But this is an unrealistic and purely theoretical solution.

Thus, the judge and jury may have different views on questions of the credibility of witnesses, each may draw different inferences from certain established groups of facts or apply circumstantial evidence in different ways. The application of the doctrine of *res judicata*, already referred to, may cause further complications and injustice. Moreover, needless interruptions and disputes may well arise over what evidence the jury should or should not hear. But a single trial of the negligence and unseaworthiness claims together to a judge and jury is subject to none of the disadvantages just described and the practical advantages of doing so are perfectly manifest, as the central core of disputed facts involved in the two claims is identical.

These considerations demonstrate, we think, some of the practical advantages of trying at least the negligence and unseaworthiness claims together to the same trier of the facts. But, once these advantages are recognized and it becomes settled procedure to try the two together to a jury, other advantages follow as a matter of course for the future by reducing calendar delays and congestion, which will be avoided by the greater number and certainty of the consolidations that are bound to result from the ruling we are now making.

We wish to make plain, however, what undue emphasis on the Hurn v. Oursler test may obscure, namely, that the fundamental desideratum is that all litigation should be decided in the manner most conducive to the just, speedy and inexpensive disposition of the business of the courts untrammelled by unnecessary technicalities and possible dilatory maneuvers. Persistent and continued efforts to attain this objective constitute one of the most admirable features of modern judicial federal practice, which has supplanted a cumbersome and inflexible procedure that inevitably led to technical and dilatory moves by litigants, while at the same time adding to the already excessive cost of litigation and to unnecessary appeals.

In using the doctrine of pendency we are aware that the term is somewhat misleading in that it implies that the unseaworthiness count is a detachable unit hanging or dependent on the Jones Act claim. In reality we find the doctrine applicable because of the fundamental singleness of the underlying claim, the fact that the Jones Act claim and the maritime claim of unseaworthiness are so intertwined factually that they cannot as a matter of practice be separated into pieces.[12] While the legal theories differ somewhat, from the standpoint of

---

action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; * * ".

12. Cf. Pate v. Standard Dredging Corp., 5 Cir., 1952, 193 F.2d 498, 502, where

for purposes of the federal removal statute, 28 U.S.C. § 1441(c), a claim of "unseaworthiness" was not a "separate and independent claim or cause of action" so as to permit removal of a Jones Act claim which cannot by itself be removed from the state court.

the parties the facts all exist as a single unit.

■ Thus, and for the reasons just stated, we conclude that the District Court on its civil side, in a case in which plaintiff seaman was entitled as of right to a jury trial of his Jones Act claim for negligence, had pendent "jurisdiction" of his maritime claim for unseaworthiness arising out of the same occurrence or transaction, and that both were properly submitted to the jury for a common law adjudication. We express no conclusion on the validity of this use of the pendent doctrine when sought to be applied to other related claims in other areas of the law.

Nor does our present holding conflict with what was decided by us in Paduano, supra. In that case we said, 221 F.2d at page 619:

"In view of the persistence of this legislative attitude and in the absence of any indication that there are situations in which it has not prevailed, we are constrained to conclude that the Congress, in enacting Section 1331 and its predecessor provisions, intended to exclude from its scope, cases such as the one now before us, in which the general maritime law is the sole substantive basis for awarding the relief claimed in the complaint."

Had we held otherwise, in view of the historical background developed in the opinion, we would not only have opened the door to a whittling away of the traditional method of trial to a judge in admiralty in maritime cases, but we would, we think, have wrongly decided the case. Here we do not have a claim based upon the general maritime law as "the sole substantive basis for awarding the relief claimed in the complaint." On the contrary, we are now dealing with a Jones Act negligence claim with respect to which the seaman, by the explicit terms of the statute, is entitled as of right to a jury trial; and we now do no more than hold that in this particular situation the Jones Act claim as alleged is so factually intertwined with the maritime claim as to carry it along into the civil side of the District Court for trial with the Jones Act claim to a court and jury.

Our discussion of this interesting problem would not be complete if we did not mention another possible solution. It cannot be, we think, that a United States District Court lacks power to do what Judge Conger did here. We have applied the doctrine of pendent jurisdiction because this seemed the theory best adapted to the preservation of the traditional method of a trial to a judge in maritime cases in admiralty. But American admiralty courts have from the earliest times since the founding of the Republic exercised their inherent powers to adjust American general substantive maritime law to new conditions by a process of development and elaboration, when the matters involved were not affected by legislation by the Congress. Perhaps the time will come when these same admiralty courts may decide to develop or elaborate upon the applicable adjective law in admiralty by adopting the common law trial to a jury in some very limited class of maritime matters. We hesitate to take such a bold step in the case before us, as we think the theory we have adopted is a rational means of deciding the case before us and the one least likely to affect adversely the general structure of the admiralty jurisdiction that has so well served its purpose over the years.

All that remains on this phase of the case is the necessity for clear and explicit instructions to the jury, and that necessity exists in every case of trial to a court and jury. In this case not only were the instructions unexceptionable, but Judge Conger took the additional precaution of formulating a series of questions to be answered by the jury with reference to each of the two separate claims. This is a desirable procedure, especially in this type of case; and requiring answers to such separate interrogatories greatly facilitates the decisional process in a court of review.

### The Instructions to the Jury

■ Appellant asserts that it was error for the trial judge to refuse to instruct the jury, as requested:

"That a seaman who refuses to undergo hospitalization pursuant to the advice of physicians forfeits any right which he may have to any damages for injuries or any prolongation thereof which such refusal brings about."

But the judge was clearly right in refusing this request. It is far from clear that the seaman left the Kings County Hospital without any doctor's permission to do so. Indeed, he seems to have left because he "disliked the place." Moreover, he left in the care of another doctor and thereafter received substantial medical treatment. He seems never to have manifested any inclination to refuse medical assistance.

### The Alleged Compromise Verdict

As above stated, the trial judge submitted a series of questions on each of the two separate claims, to be answered by the jury to aid them in determining whether the seaman was to recover damages from the shipowner, and, if so, the amount of such recovery. They related to the validity of the release, the issues of negligence and unseaworthiness, proximate cause, contributory negligence and the application of the doctrine of comparative negligence. When the jury returned to the courtroom to announce its verdict it appeared that they had not answered the questions formulated by the judge. One juror stated that the jury thought it not necessary to answer the questions, another said the questions had in fact been answered but the answers had not been filled in. The judge then sent the jury back to the jury room with clear and explicit instructions to answer the questions. Five minutes later the jury returned; they had filled in the answers and had reached the conclusion that the seaman should recover $24,600 from the shipowner. When polled each juror gave assent to the verdict thus rendered.

On the following morning the trial judge inadvertently opened the door leading to the room containing the jury pool, and saw several of the jurors there who had sat on the Bartholomew case. After a brief irrelevant exchange one juror asked, "What did you think of the verdict?" Without thinking, the trial judge replied, "Well, it might have been more." The juror then said, "Yes, that's right, we couldn't agree." "That's why we didn't answer the questions." The trial judge quickly withdrew, explaining that he did not wish to discuss the case.

■■ The motion to set aside the verdict and grant a new trial was properly denied. Under the circumstances it is immaterial that the jurors did not answer the questions before returning to the courtroom to announce their verdict; and it is settled law that statements made by jurors and not part of the trial record cannot be used to impeach their verdict. Nothing on the face of the trial record gives the slightest support to the claim that the verdict was the result of a compromise. Maher v. Isthmian Steamship Co., 2 Cir., 1958, 253 F.2d 414; McDonald v. Pless, 1915, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300; Rotondo v. Isthmian Steamship Co., 2 Cir., 1957, 243 F.2d 581, certiorari denied 355 U.S. 834, 78 S.Ct. 53, 2 L.Ed.2d 45.

Affirmed.

LUMBARD, Circuit Judge (concurring).

My concurrence in that part of the majority opinion which approves sending to the jury the unseaworthiness count, although there is no diversity of citizenship, rests on reasons quite different from those which Judge MEDINA states, and I feel that they are of sufficient importance to warrant discussion.

First, the Jones Act, 41 Stat. 1007 (1920), 46 U.S.C.A. § 688, itself authorizes this action to be tried at law and to a jury. Second, even if the only source of jurisdiction of the unseaworthiness count was in admiralty, such a count may be tried to a jury when it is tried simultaneously with a count under the Jones

Act at law. It seems to me unfortunate that Judge Medina's opinion, instead of ruling on either one or both of these bases for jury action, chooses to place the emphasis instead on "pendent jurisdiction" which thus becomes a cure-all for whatever a federal court feels will assist in the tidy and expeditious administration of justice. It seems to me that pendent jurisdiction is inapplicable both because the federal admiralty courts have adequate power to hear the unseaworthiness claim in any event, and because the invocation of the doctrine does not fully resolve the issue presented. Moreover, the application of pendent jurisdiction is inconsistent with the rationale of our prior decision in Paduano v. Yamashita Kisen Kabushiki Kaisha, 2 Cir., 1955, 221 F.2d 615, where we held that such maritime actions are not included in 28 U.S.C. § 1331 (1952), which statute confers general federal question jurisdiction on the district courts, because the historic separateness of the admiralty jurisdiction must be preserved in the absence of an express congressional mandate to alter it.

## I

### A—The Jones Act

The Jones Act itself constitutes congressional authorization for the commencement of the unseaworthiness action on the law side of a federal court and for its trial to a jury if the jurisdictional requirements of 28 U.S.C. § 1331 (1952) are otherwise met,[1] whether or

not a negligence count under the Act is pleaded, provided only that the plaintiff is of the class which is covered by the Act as currently construed. I am aware that no court has adopted this view, although several seem to have intimated it,[2] but it seems to me consonant with the history of the Act and with the repeated declarations of the Supreme Court in construction of it.

The lack of judicial attention to the terms of the Act itself is difficult to account for, since it is the provision of the Act allowing the plaintiff to make an "election" for an action "at law" with jury trial that has given rise to the problem in almost every case including this one. Instead, attention has, for example, been given to the far broader jurisdictional question whether substantially all *in personam* maritime claims may be said to arise "under the Constitution, laws, or treaties of the United States" within the meaning of 28 U.S.C. § 1331 (1952), and therefore be susceptible of trial on the law side of a federal court in the absence of diversity of citizenship.[3] But the issue presented by such cases is far broader than need be considered in the solution of the problem confronted here.

The Jones Act deals only with that aspect of maritime law governing seamen's remedies for personal injury which the Supreme Court has stated are to be considered as a unit and are to be liberally regarded by the courts.[4]

1. On these facts we need not consider the availability of jurisdiction under other federal statutes. See, e. g., Lykes Bros. S.S. Co. v. Grubaugh, 5 Cir., 1942, 128 F.2d 387; McDonald v. Cape Cod Trawling Corp., D.C.D.Mass.1947, 71 F.Supp. 838.

2. See, e. g., McCarthy v. American Eastern Corp., 3 Cir., 1949, 175 F.2d 724, 726, 727; Balado v. Lykes Bros. S.S. Co., 2 Cir., 1950, 179 F.2d 943, 945. These cases rejected the possibility that the Jones Act required an "election" between a claim of unseaworthiness and a claim of operating negligence. They construed the "election" affirmatively as providing that "an injured seaman, instead of suing

in admiralty, could at his option assert his cause of action at law regardless of diversity * * *" 175 F.2d at page 726. This affirmative construction does not appear to be based on the ground used to reject the alternative construction of the "election," viz., that an election between counts might work an estoppel by judgment. But see Jenkins v. Roderick, D.C.D.Mass.1957, 156 F.Supp. 299, 300.

3. See, e. g., Doucette v. Vincent, 1 Cir., 1952, 194 F.2d 834; Jordine v. Walling, 3 Cir., 1950, 185 F.2d 662.

4. See, e. g., McAllister v. Magnolia Petroleum Co., 1958, 357 U.S. 221, 78 S.Ct.

In relevant part the Act provides:

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; * * ".

The language of the Act with its apparently broad grant of permission to sue "at law" for "damages" for "personal injury" does not exclude an action based upon liability without fault known as unseaworthiness. On its face the Act appears to permit the seaman to sue at law for all claims that he may have for damages for personal injury sustained in the course of employment, and permits him the added advantage of certain remedial statutes originally passed for the benefit of railway workers. Only by reading the clause beginning "and in such action" as a deliberate limitation on the broad authorization of the opening clause for an action "at law" for "damages" for "personal injury" can the opposite result be reached. The question therefore is whether the second clause ought to be read as stating that the only action subject to the election authorized by the Act for a trial at law and to a jury is the action analogous to the railway workers' action for negligent injury. Nothing in the statutory language itself predicts such a result.

The statutory history is of little help. The Act, § 33 of the 1920 Amendments to the Merchant Marine Act,[5] appears to

have passed through both Houses of Congress without debate, and without discussion in committee reports,[6] and it is therefore undoubtedly true that as to the specific question here considered the Congress cannot be said to have expressed any intention. Ought the general language of the Act nevertheless to be approached with a presumption of some limitation on the grant? I think not.

In Paduano v. Yamashita Kisen Kabushiki Kaisha, 2 Cir., 1955, 221 F.2d 615, we placed great reliance on the fact that ever since 1875 the statute conferring general "federal question" jurisdiction on the district courts has been assumed to be subject to an implied exception for maritime matters. We might therefore find that in the absence of a specific manifestation of intention to alter this historic (albeit implied) exception, maritime jurisdiction remains maritime. Even the discovery of so strong a presumption would not end the problem, however, since the Jones Act itself specifically removes a *maritime* claim from the admiralty courts at the plaintiff's election. The Supreme Court held in Panama R. Co. v. Johnson, 1924, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748, that the remedy afforded seamen under the railway Acts was given in modification of and consequently was part of the maritime law. The question would therefore remain whether in allowing an election under the Act for an action at law with a jury trial the Congress should be presumed to have intended to carve up the mode of trial for seamen's maritime claims for personal injury and to have provided the election as to the new maritime count but not as to the old.[7]

1201, 2 L.Ed.2d 1272; Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368; Baltimore S.S. Co. v. Phillips, 1927, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069.

5. 41 Stat. 1007 (1920).

6. See S.Rept. 573, H.Rept. 1093, H.Rept. 1102, H.Rept. 1107, 66th Cong., 2d Sess. 1920.

7. The doubtful authority of the floor debates suggests that such a presumption should not be applied to the Act's

sponsor, Senator Jones. In response to a question directed to the effect on admiralty jurisdiction of another provision of the 1920 amendments, the Senator replied: "I will say to the Senator that this deals very largely with admiralty matters, and I am not familiar with admiralty practice." 59 Cong.Rec., part 7, p. 6992, May 13, 1920. I cite this only to indicate the extent to which the attribution of a presumption of intention to preserve the status quo of admiralty practice may become fictional.

Despite the generality of the statutory language, if in 1920 there was a significant difference in the nature of the claims for unseaworthiness and the new claim afforded under the railway Acts it might be argued that the Congress, in recognition of the difference, intended to provide an altered mode of trial only for the new negligence count. Before proceeding to examine this possibility it is well to note however that it contains an element of fiction. Jury trial for these maritime matters was not new in 1920. Ever since 1789 it has been available in the state courts by virtue of the "saving clause," 1 Stat. 76–77, now 28 U.S.C. § 1333(1) (1952), and in the federal courts by virtue of the same clause coupled with the grant of jurisdiction at law in diversity, 28 U.S.C. § 1332 (1952). Only maritime claims asserted in the federal courts at law and in the absence of diversity would have been subject to the supposed exception in the Jones Act. But the broad language of the Act provided for juries in all courts which try actions "at law" without apparent exceptions. Nevertheless, it is not impossible that such an exception was contemplated for the federal courts if indeed there was a significant difference in the nature of the claims. It appears, however, that there was not.

The doctrine that an action for unseaworthiness imposes a species of liability "without fault" for personal injury peculiar to maritime law is of very recent vintage, appearing first in the Supreme Court in Mahnich v. Southern S.S. Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 and Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.[8] Earlier, in Baltimore S.S. Co. v. Phillips, 1927, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069, for example, the

owner's liability for injuries due to unseaworthiness was thought to turn on his "negligence."[9] It may have been true, of course, that a very severe duty of diligence was placed upon the owner to provide a seaworthy ship with seaworthy appliances. But if there was such a duty of care in excess of that familiarly required at common law, it is now plain that a similarly heightened duty of diligence was imposed by the Jones Act as well. See Cortes v. Baltimore Insular Line, 1932, 287 U.S. 367, 53 S.Ct. 173, 77 L.Ed. 368. Thus, in 1920 at least, no distinction could have been drawn between the absolute character of the maritime duty imposed by the action for unseaworthiness, and the duty of due care imposed by the incorporation of the railway statutes in the new Act. There was a difference between the old law and the new duty of course, but it was the difference between a liability for the negligent provision of the vessel, and its negligent operation. It was liability for the latter which Chelentis v. Luckenbach S.S. Co., 1918, 247 U.S. 372, 38 S.Ct. 501, 62 L.Ed. 1171, held was not imposed by the exclusive maritime law, and it was apparently to circumvent the Chelentis decision that the 1920 amendment was enacted. It is difficult to find that the Congress which spoke in the broad terms of the Jones Act nevertheless should be presumed to have intended to distinguish between the modes of trial appropriate to the proof of two negligence counts.

Furthermore, the recent growth of the scope of the unseaworthiness remedy to encompass an increasing proportion of those cases formerly regarded as involving only operating negligence, see Gilmore & Black, The Law of Admiralty, § 6–39 (1957), thus rendering somewhat

---

8. The earlier cases announcing an absolute liability in actions for cargo damage do not appear to have been thought controlling. See, e. g., The Caledonia, 1895, 157 U.S. 124, 15 S.Ct. 537, 39 L. Ed. 644.

9. The circuit courts were divided on the question whether due diligence would

satisfy the obligation to provide a seaman with a seaworthy vessel. Compare The Tawmie, 5 Cir., 1936, 80 F.2d 792 and Burton v. Greig, 5 Cir., 1921, 271 F. 271, with The H. A. Scandrett, 2 Cir., 1937, 87 F.2d 708. In The Fullerton, 9 Cir., 1908, 167 F. 1, 8, 11, the court seems to have taken both views.

superfluous the incorporation of the railway acts into the maritime law, suggests that there would have been considerable wisdom in the view that seamen's remedies should be treated as a unit by the courts. At least it is true that in the light of this development there is no good purpose served by a distinction in the mode of trial of these counts especially as it creates untoward problems of judicial administration. Since the language that the Sixty-sixth Congress used in no way intimates that it regarded these claims as other than a single action "at law" for "damages" there does not seem to me now to be any reason for supposing that it intended otherwise.

In the early cases a view was taken of Jones Act remedies that would probably have precluded the analysis I have suggested had the view been upheld. In dictum in Panama R. Co. v. Johnson, 1924, 264 U.S. 375, 44 S.Ct. 391, 392, 68 L. Ed. 748, the Supreme Court first suggested that the phrase "at his election" meant that the plaintiff in order to sue under the railway provisions of the Jones Act had to seek "either the relief accorded by the old rules *or* that provided by the new rules. The election is between alternatives accorded by the maritime law as modified * * *." 264 U.S. at pages 388, 389, 44 S.Ct. at page 394. See also Pacific S.S. Co. v. Peterson, 1938, 278 U.S. 130, 137, 138, 49 S.Ct. 75, 73 L.Ed. 220. If this implication had been carried forward it would have meant that the Act provided only an "election" to choose the railroaders' remedies in lieu of the old maritime counts, and did not provide permission for an action at law to qualified suitors seeking redress based on maritime counts for

personal injuries. This was a curious view to take of a remedial statute, and the Supreme Court has recently found a footnote reference sufficient to discredit it. McAllister v. Magnolia Petroleum Co., 1958, 357 U.S. 221, 222, note 2, 78 S.Ct. 1201, 2 L.Ed.2d 1272.

In another line of cases the Supreme Court appears to have taken the view that seamen's remedies are to be regarded as a unit for purposes of trial. In Baltimore S.S. Co. v. Phillips, 1927, 274 U.S. 316, 47 S.Ct. 600, 71 L.Ed. 1069, the Court held that a federal "splitting" rule would operate against a plaintiff who pleaded only one of the two claims for unseaworthiness and operating negligence and that the doctrine of *res judicata* would bar the later assertion of the unlitigated claim.[10] The possibility of such estoppel by judgment is of course not conclusive of the question of the existence of jurisdiction at law and to a jury for the seaman's unseaworthiness claim. Attention has recently been called to the fact that it may be doubted whether the Baltimore rule would apply if the Jones Act claim for operating negligence were pleaded on the law side of a federal court in which there was no jurisdiction to hear the maritime claim. Jenkins v. Roderick, D.C.Mass.1957, 156 F.Supp. 299, 300.[11] It seems to me, however, that this is somewhat aside from the point. Only if it were supposed that the Congress did not deal with "two grounds" for the same *maritime* "cause of action" would the Act be read to grant jurisdiction for an action at law for only "one-half" of the cause of action. This is an area in which both of the "halves" are created

---

**10.** Referring to the alleged difference in claims for unseaworthiness and operating negligence the Court used language closely paralleling the Act itself: "In either view, there would be but a single wrongful invasion of a single primary right of the plaintiff, namely, the right of bodily safety * * *" 274 U.S. at page 321, 47 S.Ct. at page 602.

**11.** The Baltimore rule could be applied without undue hardship even in this circumstance, however, by imposing the requirement that an appropriate libel be filed simultaneously in admiralty. Thus it may also be doubted whether the compartmentalized character of the district court's jurisdiction over these claims *would, even in the situation supposed,* be allowed to overcome the salutary rule of the Baltimore case.

by federal law and the subject is controlled by the Congress in "its substantive as well as its procedural features." Panama R. Co. v. Johnson, 1924, 264 U.S. 375, 386, 44 S.Ct. 391, 393, 68 L.Ed. 748. This is not a case in which the second "ground" comes from a body of local law over which the Congress could not or plainly did not exert power. It seems to me anomalous to assume that the inclusive federal power was exercised so as to create a purposeless dilemma in the mode of trial.

For these reasons [12] I would hold that the Jones Act, in permitting an action "at law" for "damages" for "personal injury" to seamen, permitted them such an action based on the maritime doctrine of unseaworthiness as well as the legislative maritime doctrine of negligent operation.[13] This is precisely the result reached by the court by a somewhat more elaborate route, so that whenever a Jones Act claim is pleaded at law and is tried with a claim in unseaworthiness, the claims may now be tried together in a common law action to a jury without regard to an independent basis of jurisdictional law for the unseaworthiness count.[14]

### B—Jury Trial in Admiralty Cases

In the closing lines of its opinion the majority states categorically the principle that if a claim is regarded as on the admiralty side of the district court it must then be tried to the court without a jury, as has been customary in admiralty proceedings. It apparently assumes, since it nowhere discusses the question, that if the claim were properly on the law side of the district court the jury-right would automatically attach.[15] It thus converts the question of the propriety of jury trial, which it has already decided on a priori standards of convenience, into one of jurisdiction, which it similarly decides on the ground of convenience. I do not believe that, apart from the Jones Act, it is necessary or desirable to reach difficult questions of jurisdiction in deciding the question presented here. If I did not believe that the

12. An alternative possibility suggested by Turcich v. Liberty Corp., 3 Cir., 1954, 217 F.2d 495, 496 should be noted.

13. I am aware that a problem of the applicability of the three-year statute of limitations on the Jones Act count for operating negligence to the unseaworthiness count may be raised by this approach. The facts here do not present the problem. It is enough to note that the application of the limitation may not be a necessary result, and, with the opposite emphasis, to point to McAllister v. Magnolia Petroleum Co., 1958, 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272, with particular reference to the concuring opinion of Mr. Justice Brennan.

14. As the court notes, the retention of the maintenance and cure count by the district court was agreed to by both parties.

15. It makes this assumption although it does not discuss the applicability of the Seventh Amendment to the unseaworthiness count once it is found to be properly on the law side, and apparently believes that the fact that the claim is "pendent" to a Jones Act count is sufficient ground for trial to a jury of all issues, including application of the definition of unseaworthiness itself. It has been held that the Amendment does not apply because the remedy of "divided" damages for unseaworthiness when the plaintiff is contributorily negligent, prescribed as a matter of federal law for unseaworthiness actions, Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, is not a "common law" remedy. Jenkins v. Roderick, D.C.D.Mass.1957, 156 F.Supp. 299, 302–304. The difficulty with this suggestion is that it would undermine the basis of federal jurisdiction at law since if the action is not one for a "common law" remedy it is not "saved" by the saving clause, 28 U.S.C. § 1333(1) (1952), and is exclusively for the federal admiralty courts. See 71 Harv.L.Rev. 1359, 1362 (1958). Furthermore, even if this objection were overcome by assuming a difference in meaning for the words "common law" as used in the amendment and the saving clause, jury trial would be defeated even for unseaworthiness actions based on the diversity jurisdiction at law, 28 U.S.C. § 1332 (1952). It is difficult to believe that this is a necessary consequence of the holding in Pope & Talbot, supra. It seems more reasonable, if there is any doubt of the applicability of the Seventh Amendment, that the common-law may now be regarded as competent to divide damages in certain cases.

Act provided for jurisdiction at law I would hold that an unseaworthiness count properly pleaded in admiralty may be tried there to a jury if in the court's discretion it is tried simultaneously with a related claim at law under the Jones Act, whether or not there is an independent basis of jurisdiction of the maritime count at law.[16] Since the convenience of joint trial of the unseaworthiness count to a jury is the only ground offered to support each step of the court's decision, it seems to me that this would be a more direct and therefore adequate response to the underlying problem. The court could exercise control over the joinder of such admiralty and law claims when it decided the motion to consolidate the separate actions for purposes of trial. If the delay would be untoward because of really serious docket congestion, or if serious prejudice might result to the objecting party, the court for reasons sufficient to overcome the obvious desirability of joint trial could deny the motion. Once consolidation is achieved, however, the same practical reasons which persuade the court that jury trial is appropriate would carry the unseaworthiness count to the Jones Act jury.

It is true that this solution is not without some difficulty, since such precedent as there is on the matter of jury trial for non-jury counts joined with counts triable to a jury under Constitution or statute points in the direction of preservation of the separate modes of trial to court and jury. Thus when the equity and law courts were merged, an effort was made to determine whether the claim asserted was "primarily legal" or "primarily equitable" and the determination governed the mode of trial selected. The mere presentation of a claim at law for damages was not of itself enough to take a "primarily equitable" claim to a jury. See 5 Moore's Federal Practice §§ 38.16–38.19. We could apply a similar approach and simply hold that the Jones Act claim is always "primary" when accompanied by a count in unseaworthiness. But one may imagine cases in which the issue of negligence might be so much more doubtful than that of the unseaworthiness of the vessel as to render the holding fictional.

Of course it would be possible to preserve the separate modes of trial even after consolidation by simply having the court decide the unseaworthiness counts. Under Pacific S.S. Co. v. Peterson, 1928, 278 U.S. 130, 49 S.Ct. 75, 73 L.Ed. 220, if the jury returned a Jones Act verdict for the plaintiff that would be the end of the matter. If it found for the defendant the determination of the maritime count would be up to the court. Unlike the majority I do not believe that the resulting problems in the nature of *res judicata* or collateral estoppel would be insurmountable. For that matter, as I will show below, I do not believe that these problems can be avoided even by the court's method of solution. But as we are unanimous in the conclusion that it is proper to try both counts to the jury, I am not dissuaded by the distant analogy of the law-equity merger and its attempts to preserve historically separate modes of trial. The point is that the problem of the propriety of joint jury trial is not made more amenable to solution by the discovery of pendent jurisdiction of the maritime count on the law side unless it is found that the Seventh Amendment guarantees a jury right on the unseaworthiness claim, a matter which the court nowhere discusses.

The majority expressly declines to employ the route I propose because it says: (1) as against the trial of certain admiralty counts to a jury the discovery of a hitherto nearly unknown jurisdiction at law over maritime matters is "least likely to affect adversely the general structure of the admiralty jurisdiction," and (2) because the step of trying an admiralty count to a jury is "bold" when contrasted with the timid assumption of a novel jurisdiction at law. It could

16. Whether the unseaworthiness count can be separately pleaded in admiralty when there is a basis for jurisdiction of it at law and the Jones Act count is pleaded at law is a separate question. See note 17, infra.

be maintained, I think, that the extension of coordinate jurisdiction of the federal courts at law poses as great a threat as can be imagined to what remains of the exclusivity of the admiralty prerogatives in seamen's cases. However, I merely note that so long as the rule of joint trial to a jury is confined to those admiralty claims which are tried with a related Jones Act claim there is absolutely no difference in practical effect between considering the trial of certain admiralty matters when joined with claims at law as *sui generis* and trying them to a jury, and treating some of them as properly brought at law solely in order to reach the same result. The two routes seem equally capable of giving rise to further erosions of admiralty prerogatives. Not only has the majority's dealing with jurisdiction accomplished no good; it seems to me that it may give rise to considerable harm.

## II

### A—Pendent Jurisdiction

But the majority, by ruling that an unseaworthiness claim for which statutory jurisdiction exists only in admiralty may not be tried to a Jones Act jury, has chosen to consider the issue of jury trial to be a jurisdictional issue which it resolved by finding pendent jurisdiction of the admiralty count on the law side of the federal court. I cannot agree with the application of this doctrine to sustain jurisdiction in a federal law court over a count for which there is federal jurisdiction in a federal court of admiralty, even if the result in cases such as these will not be to work an increase of federal jurisdiction at the expense of the state courts.

The origin of the concept of pendent jurisdiction was, as the majority notes, the serious problems of judicial administration which resulted from the existence of separate federal and state claims for the same injury. If the state claim could not be tried in a federal court when substantially identical federal claims were tried there, in many cases there would have been a complete duplication of the effort of litigation in the state courts. The alternative to such duplication would have been an untoward extension of the doctrine of *res judicata* to require the plaintiff to forego his state claim if he litigated and lost in the federal courts, despite the fact that the federal courts never purported to have jurisdiction of the state claim. Hurn v. Oursler, 1933, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148, was the basic solution to the dilemma, and the bedrock on which it rested was that without "pendent" jurisdiction the state claim could not have been tried at all in the federal forum.

Furthermore, the Hurn rationale arises in an area which is not practically susceptible of legislative control except by occasional intervention in areas in which the federal-state overlap is very frequent. See 28 U.S.C. § 1338(b) (1952). It has been noted that the very fact that a Constitutional barrier to the Hurn doctrine might have been thought to exist indicates the strength of the doctrine and its ability to overcome the relatively minor non-constitutional issue presented here. Jenkins v. Roderick, D.C. D.Mass.1957, 156 F.Supp. 299, 301. But the issue of *jurisdiction* with which the court believes itself to be confronted here is plainly within easy legislative grasp, as we so forcefully noted in Paduano v. Yamashita Kisen Kabushiki Kaisha, 2 Cir., 1955, 221 F.2d 615. Moreover the problem is one which exists wholly *within* the framework of the federal courts, and which is amenable to solution by the simple device either of joint trial, or gradual evolution of the doctrine of *res judicata*. If it does appear that the Congress has not vested jurisdiction of these claims in the federal law courts, it is not the function of those courts to invent a new basis of jurisdiction.

Finally, the majority's resort to pendent jurisdiction is least satisfactory when it rests frankly on its only sound basis, viz., that it is desirable to avoid what would be difficult problems of *res judicata* if separate trials were held, or if joint trial to court and jury separately

were the rule. It seems to me that no conceivable adaptation of the pendent jurisdiction rationale could cope with the situation presented when a plaintiff who does not possess diversity from the defendant now pleads a Jones Act count at law and demands a jury, and pleads his unseaworthiness count by a libel *in rem* and *in personam* in admiralty. Assuming that the actions are consolidated for purposes of trial, the court's present logic requires that the count in admiralty, where the jury may not intrude, be tried to the court without a jury, since the claim is in admiralty and since "pendent jurisdiction" could hardly be thought to have destroyed that traditional basis of jurisdiction.

I believe, however, that the court would find the considerations of convenience sufficiently compelling to reach the result of joint trial to the jury in such a case. It could do so of course by applying the Baltimore [17] rule to require that the unseaworthiness count be pleaded at law or lost. But this would merely be an oblique way of holding that the "election" provided by the Jones Act includes both counts, and that they may not be divided, which merely states what I have already suggested, that the Jones Act provides an affirmative basis of jurisdiction of the unseaworthiness count at law. Or the court might hold that, although pleaded in admiralty, the count may nevertheless be tried to a jury because it is tried with the Jones Act count, which is simply to state, as I have alternatively suggested, that claims properly pleaded in admiralty may, in an appropriate and limited class of cases, be tried to a jury. Thus resort to "pendent jurisdiction" is unnecessary.

### B—Jurisdiction Under 28 U.S.C. § 1331

Finally, I believe that the majority's decision that there is pendent jurisdiction of the maritime claim on the law side of the federal court is in conflict with our decision in Paduano v. Yamashita Kisen Kabushiki Kaisha, supra, which Judge Medina reaffirms but distinguishes by confining it to its facts. In Paduano we held that an unseaworthiness count brought on the law side of a federal court did not fall within the jurisdictional requirements of 28 U.S.C. § 1331. In the absence of diversity of citizenship, and since, as the majority here points out, no one asked us to permit a transfer to the admiralty docket, we dismissed the action.

We gave two reasons for the result we then reached.[18] The first of these was that maritime matters do not fall within the rationale which apparently gave rise to § 1331, viz., that there ought to be a federal forum of first instance for the vindication of federal rights. Since as to maritime matters there has since 1789 been separate federal jurisdiction in admiralty, no extension of jurisdiction at law was necessary to assure litigants of a federal forum. The second reason given was that whereas the Congress has seen fit to use special statutory grants when it desired to modify the prerogatives of admiralty, as by the provision of jury trial for certain maritime matters, it has made no such grant with regard to unseaworthiness claims.

Thus the foundation of Paduano was that the federal courts of admiralty have since the first Judiciary Act provided an adequate federal forum for the proper trial of all maritime matters, and that in the absence of express congressional in-

17. If the Jones Act does provide an independent basis of jurisdiction at law, the "election" provided by the Act may require that both claims be pleaded and tried on a single side of the district court.

18. Although the case of American Insurance Co. v. Canter, 1828, 1 Pet. 511, 26 U.S. 511, 7 L.Ed. 242, was relied upon for the proposition that the classes of "Cases" over which jurisdiction is enumerated in Article III are historically recognized as separate, it was not suggested that they were ever regarded as exclusive, and therefore reliance on the case was not critical to the result.

tervention the courts themselves would not be the innovators of a novel jurisdiction. Yet the majority now holds that despite the fact that the unseaworthiness claim could have been pleaded and tried to a federal admiralty court a novel jurisdiction at law is appropriate solely because of the desirability of jury trial for which it believes the Congress has not otherwise provided. I think that the two views cannot be reconciled.

It is of course true that to hold, as I have alternatively suggested, that the adjective law of admiralty may in these cases be judicially developed is itself inconsistent with our emphasis in Paduano on congressional control of such matters. But this conflict is surely less fundamental than that created by the court's resort to a novel jurisdiction.

Furthermore, the conflict of this decision with Paduano is more than merely theoretical. The result will be a nearly total abandonment of Paduano. It will be a simple matter for all plaintiffs who now desire a jury trial to plead both an unseaworthiness count and its related Jones Act count in every case.[19] The cases will be few if any in which it will be possible to say that the Jones Act claim is so frivolous as to be unable to support the "pendent" claim and take it to the jury.

Thus it seems to me that the majority has for all practical purposes abandoned without discussion the substance of the jurisdictional grounds used to support the decision in Paduano, while it has used as its justification here a doubtful proposition of federal power.

It seems to me both unnecessary and most unfortunate that we give further support to the vague and troublesome doctrine of pendent jurisdiction. It is a highly salutary principle that the federal courts may not assume jurisdiction unless jurisdiction has been unequivocally and constitutionally conferred upon them by an act of the Congress. At a time when much is said and written about the

desirability of curtailing federal jurisdiction and when the Congress has but recently enacted legislation toward that end, 28 U.S.C. § 1332, as amended 72 Stat. 415 (1958), we should not look the other way.

---

19. The Paduano case itself, as Judge Medina implies, is not disturbed, since the plaintiff there could not have maintained a colorable action under the Jones Act.