**Complaint of TA CHI NAVIGATION (PANAMA) CORP., S.A., As Owners of the S/S EURYPYLUS for exoneration from or limitation of liability.**

No. 75 Civ. 5994 (CHT).

United States District Court, S. D. New York.

Dec. 8, 1978.

Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, for petitioner Ta Chi Navigation (Panama) Corp., S.A.; Vincent J. Barra, James E. Ryan, New York City, of counsel.

Due, Dodson & DeGravelles, Baton Rouge, La., for certain claimants; Richard J. Dodson, Baton Rouge, La., Harvey F. Gerber, Jr., New York City, of counsel.

## OPINION

TENNEY, District Judge.

On November 10, 1975, while en route from Kobe, Japan to New Orleans, Louisiana, and other ports, the S.S. Eurypylus sustained an explosion and fire at sea. After unsuccessfully fighting to control the fire, the crew abandoned the vessel. On November 17, 1975, the first claim for failure to deliver cargo was filed in this Court. Following that filing, the owner of the vessel, Ta Chi Navigation (Panama) Corp., S.A. ("Ta Chi"), filed a complaint seeking exoneration from or limitation of liability. Among the many claimants in the limitation proceedings are personal injury and death claimants. At the time that the original claims were filed, Elpidio B. Donato and Gregorio S. Fernandez were the personal injury claimants, and Adelaida M. Fernandez, widow of Elizalde Fernandez, sued individually, as guardian of the estate of her minor children, and as the personal representative of the estate of her deceased husband. On November 28, 1977, Gregorio Fernandez, still hospitalized from injuries received in the explosion and fire, died. His widow, Delia Ruiz Fernandez, has since entered this lawsuit for herself, her children, and her husband's estate. In May 1978, Elpidio Donato and Delia Ruiz Fernandez moved for summary judgment for maintenance and cure. Specifically, the claimants in that motion sought maintenance and cure, damages, prejudgment interest, burial expenses, attorneys' fees, and costs. Finding that genuine issues of material fact remained to be tried, the Court denied the motion for summary judgment in a memorandum endorsement dated August 8, 1978. The Court made no finding regarding the governing law in the litigation of the personal injury and death claims. That choice of law is now before the Court. After examining the record, the Court concludes that it must hold a hearing to develop further the facts essential to determining the applicable law.[1]

The facts about which there appears to be no dispute include the following. The explosion and fire occurred while the Eurypylus, a vessel flying the Panamanian flag, was in international waters en route from Japan to Gulf and east coast ports in the United States and to various Caribbean ports. The personal injury and death claimants were all citizens of the Republic of the Philippines. The two claimants surviving after the accident were treated first in the United States, then returned to the Philippines. Each had signed shipping arti-

---

1. The Court will not in this opinion pass on the merits of the various personal injury and death claims.

cles in the Philippines, and each such contract provided for the application of either Panamanian Maritime Law or Philippine Labor Law, whichever was found to be more beneficial to the seamen. At the time of the explosion and fire, the Eurypylus was owned by Ta Chi, a Panamanian corporation. The vessel was then under the management, charter, or operation of Ta Peng Steamship Co., Ltd. ("Ta Peng"), the latter's precise relationship with Ta Chi needing further clarification.

The claimants argue that their claims have substantial contacts with the United States and that, accordingly, United States general maritime law and the Jones Act, 46 U.S.C. § 688 ("Jones Act" or the "Act"), should apply. Ta Chi argues, *inter alia*, that the claims lack a substantial relationship with the United States and that in the interests of comity the claimants should be left to their contractual benefits as interpreted by the National Seamen's Board of the Republic of the Philippines. In order to avoid repetition, the parties' specific arguments will be stated and addressed in the discussion of various alleged contacts between the claims and the United States.

### Discussion

The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may . . . maintain an action for damages at law." Read literally, the Act requires not even the slightest connection between the seaman, the employment, or the injury and the United States. "[A] hand on a Chinese junk, never outside Chinese waters, would not be beyond its literal wording." *Lauritzen v. Larsen*, 345 U.S. 571, 576–77, 73 S.Ct. 921, 925, 97 L.Ed. 1254 (1953). Courts have, however, restricted the application of the Act. In *Lauritzen*, the Supreme Court held that the hiring of the injured seaman in the United States, returning him here, and having a forum in the United States were

insufficient bases for applying the Jones Act. Although the seaman had stressed the owner's frequent and regular contact with American ports, the Court appears to have given it no weight in assessing the contacts between the claim and the United States. *Id.* at 581–82, 73 S.Ct. 921.[2] In broad dicta, the Court discussed criteria that influence the determination of applicable law in maritime tort claims. The seven criteria are the place of the wrongful act, the law of the flag, the allegiance or domicile of the injured seaman, the allegiance of the shipowner, the place of contracting, the inaccessibility of a foreign forum, and the law of the forum. *Id.* at 583–92, 73 S.Ct. 921. In *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 381–84, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959), the Court concluded that the *Lauritzen* factors applied with equal force under general maritime law as well as to the Jones Act and held that New York injury and treatment were insufficient bases for the application of United States law.[3]

In *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970), the Supreme Court was again faced with the question of the Jones Act's reach. Focusing on the question whether the shipowner was an "employer" under the Act, five members of the Court agreed that the Jones Act should apply. Four of the *Lauritzen* factors favored the owner, but the Court reasoned that the *Lauritzen* test is not a mechanical one to be applied by weighing the factors. Rather, the Court stated, a decision must be made—in light of the national interest served by the Jones Act—whether the contacts between the transaction and the United States are "substantial." *Id.* at 308–09 & n. 4, 90 S.Ct. 1731, *quoting at length Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437, 441 (2d Cir.), *cert. denied*, 359 U.S. 1000, 79 S.Ct. 1138, 3 L.Ed.2d 1030 (1959). Furthermore, the Court reasoned that the list of

---

2. The Supreme Court later took a different view. *See Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 310, 90 S.Ct. 1731 (1970) (discussed *infra*).

3. In *Romero*, the Supreme Court approved the district court's dismissal on forum non conveniens grounds.

factors in *Lauritzen* is not exhaustive. Another factor of importance in determining whether the Jones Act is applicable is the owner's base of operations. *Rhoditis, supra,* 398 U.S. at 309, 90 S.Ct. 1731, *citing Pavlou v. Ocean Traders Marine Corp.,* 211 F.Supp. 320, 324–25 (S.D.N.Y.1962). In *Rhoditis,* the base of operations contact was established because the shipowner, although a Greek corporation, was ninety-five percent owned by a Greek citizen who had resided in the United States since 1945 and who managed the corporation from offices in New York and New Orleans. Additionally, the ship on which the seaman had worked was engaged in regular runs to and from the United States: its entire income was derived from cargo originating or terminating in the United States. "We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act 'employer.'" *Rhoditis, supra,* 398 U.S. at 310, 90 S.Ct. at 1734.

In *Bartholomew, supra,* 263 F.2d at 439–41, the Second Circuit confronted the "vagueness" and "lack of any common principle of decision" in the Jones Act law and concluded that the Jones Act may be applied if the contacts are substantial, *i. e.,* if the facts present "something between minimal and preponderant contacts." *Id.* at 440.

> [E]ach factor is to be "weighed" and "evaluated" only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question of whether all the factors present add up to the necessary substantiality. Moreover, each factor, or contact, or group of facts must be tested in the light of the underlying objective, which is to effectuate the liberal purposes of the Jones Act.

*Id.* at 441. Based on contacts, substantial in the aggregate, that the injury, the seaman, and the employer had with the United States, the *Bartholomew* court held the Jones Act applicable to the transaction.

Subsequent Second Circuit cases have pursued this broad inquiry into contacts between transactions and the United States, and in the process they have further identified the kinds of factors that are relevant to the question whether the Jones Act is applicable. *See Antypas v. Cia. Maritima San Basilio, S.A.,* 541 F.2d 307 (2d Cir. 1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470 (2d Cir.), *cert. denied,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974) (both discussed *infra* ).

### Law of the Ship's Flag

■ In *Lauritzen* dicta, *supra,* 345 U.S. at 584–85, 73 S.Ct. at 929–930, the Supreme Court considered the law of the flag to be "[p]erhaps the most venerable and universal rule of maritime law," a factor that "overbears most other connecting events in determining applicable law." Here, the claimants do not dispute that the Eurypylus flew the Panamanian flag. They argue, however, that the Panamanian flag is merely a "flag of convenience" entitled to no weight in this determination. In this contention they are correct. In *Lauritzen,* the Supreme Court, even while recognizing the importance of the ship's flag, acknowledged the practice of seeking foreign registration to avoid stringent shipping laws. *Id.* at 587, 73 S.Ct. 921. This practice will not insulate an owner from the Jones Act. *E. g., Bartholomew, supra,* 263 F.2d at 441–42, *approved in Rhoditis, supra,* 398 U.S. at 310, 90 S.Ct. 1731; *Pavlou, supra,* 211 F.Supp. at 323–24. The record in this case establishes that Ta Chi and the Eurypylus were without ties to Panama beyond mere registration. *See, e. g.,* Ta Chi's Answers to Interrogatories, dated February 6, 1978, at ¶¶ 2, 3, 12, 27 (owners, officers, directors, operators, and agent not Panamanian); Deposition of O. Arnold Larsen, taken March 10, 1978, at 14 ("Larsen Deposition") (business not Panamanian). The illusory nature of the flag of the Eurypylus, while it does not lend substantially to American contacts,

does preclude resort to the law of the ship's flag, on the basis of registration alone, to govern the instant claims.

*Allegiance of the Shipowner*

■ The discussion under "Law of the Ship's Flag" applies with equal force here. To effectuate the liberal purposes of the Jones Act, "the facade of the operation must be considered as minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States." *Rhoditis, supra,* 398 U.S. at 310, 90 S.Ct. at 1734, *citing Bartholomew, supra,* 263 F.2d at 442. The Court clearly may look, as claimants urge, beyond the Panamanian corporation to its ownership. In so doing, the Court finds the record unclear as to the extent of American ownership. Byron P. Shaw, a director and officer of Ta Chi, and a brother to one of its major stockholders, told Arnold Larsen, vice-president of the operator's agent at the time of the explosion and fire, that Shaw owned twenty percent of Ta Chi. Larsen Deposition at 9–10, 41. Shaw was then a naturalized American citizen residing in the United States. *Id.* at 10. Ta Chi, however, when asked to list its stockholders up to the time of the accident, suggested that Shaw is not now an owner. Ta Chi's Answer to Interrogatories ¶ 2. Ta Chi equivocated similarly in answer to a later question, responding that Shaw was a director and officer of Ta Chi at the time of the accident, but failing to provide any ownership information as the question directed it to do. *Compare* Claimant's Interrogatories ¶ 12 *with* Ta Chi's Answer to Interrogatories ¶ 12.[4]

■ *Bartholomew, supra,* 263 F.2d at 443 n.4, suggested that American ownership is by itself sufficient to apply the Jones Act. *See Moncada v. Lemuria Shipping Corp., supra,* 491 F.2d at 473 (all stock owned by Americans, but other contacts present); *Bo-*

*bolakis v. Compania Panamena Maritima San Gerassimo,* 168 F.Supp. 236, 238 (S.D.N. Y.1958) (holding majority ownership *and control* a sufficient basis for applying the Jones Act, but citing a split in authority in the Southern District of New York). *But see De Mateos v. Texaco, Inc.,* 562 F.2d 895 (3d Cir. 1977); *cf. Fitzgerald v. Texaco, Inc.,* 521 F.2d 448 (2d Cir. 1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976) (a forum non conveniens case; ownership factor not developed). How much ownership is sufficient to constitute a substantial contact with the United States is unclear. *Compare, e. g., Southern Cross Steamship Co. v. Firipis,* 285 F.2d 651 (4th Cir. 1960), *cert. denied,* 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961) (Jones Act applicable when twenty percent American ownership, effective control by American interests, United States the place of injury, and some evidence that some of Greek owners residents of United States) *with Fitzgerald v. Zim Israel Navigation Co.,* 1975 A.M.C. 1425, 1429 (S.D.N.Y.1975) (a one-quarter American interest not a substantial contact absent American control over the ship's operation). An informed assessment of the substantiality of the contacts that the transaction in the instant case has with the United States must wait until the extent of American ownership is established, but even then the determination of substantiality cannot rest on any mathematical formulation. *See Rhoditis, supra,* 398 U.S. at 308, 90 S.Ct. 1731; *Bartholomew, supra,* 263 F.2d at 440–41; *Pavlou, supra,* 211 F.Supp. at 325 (percentage figures by themselves mean little for the purpose of determining de facto control).

*Base of Operations*

After *Lauritzen,* the Supreme Court added the shipowner's base of operations to the list of factors that should be considered in determining whether the contacts between a transaction and the United States are substantial. *Rhoditis, supra,* 398 U.S. at

---

4. Ta Chi stated that at the time of the accident, Byron P. Shaw was among those who were authorized to withdraw funds from Ta Chi's New York bank account. Answers to Interrog-

atories ¶ 58. Although this fact is not inconsistent with Shaw's position as officer and director, it suggests that Shaw's relationship to Ta Chi should be explored further.

309, 90 S.Ct. 1731, approving *Pavlou, supra,* 211 F.Supp. at 325. In *Pavlou,* the court intended "base of operations" to refer to the place where the vessel is actively managed and directed. The claimants argue that the instant case presents the same American contacts and an American base of operations as found in *Pavlou, Bartholomew,* and *Rhoditis.* The claimants have not yet, however, established the extent of control exercised in the United States as shown in *Rhoditis, supra,* 398 U.S. at 307, 90 S.Ct. 1731 (ninety-five percent owner lived in Connecticut and managed corporation from New York office; another office in New Orleans); *Bartholomew, supra,* 263 F.2d at 441 (all of officers of owning corporation were American citizens; principal place of business in New York; Liberian office was a mere formality); or *Pavlou, supra,* 211 F.Supp. at 323–24 (vessel managed exclusively by New York entity). Although Ta Chi and Ta Peng both appear to be based in Taiwan, *see, e. g.,* Ta Chi's Answers to Interrogatories ¶¶ 14, 15, the question here is whether those entities have other bases in the United States or have delegated their control over the Eurypylus to the American agent to the extent that the base of operations for the vessel may be said to be in New York regardless of the Taiwanese connection. This alleged delegation of control may more properly be addressed under the related topic of agency.

*Agents for the Vessel*

■ Operation of a vessel by an American agent of a shipowner constitutes contact with the United States. *Antypas, supra,* 541 F.2d at 309–10; *Moncada, supra,* 491 F.2d at 473. In *Antypas, supra,* 541 F.2d at 309, the shipowner delegated authority to a London agent to redelegate to the latter's American subagent the authority over booking and cargo solicitation and

over collection of freight and passenger revenues. Pursuant to the agreement between the owner and the agent, the subagent was given the power to fix rates, allocate tonnage and space sailings. The subagent's direct control of the vessel, partial ownership of the vessel by Americans, and the collection of earnings and the payment of expenses in New York, were held to be substantial contacts with the United States. *Id.* at 310 (whether they were substantial only in the aggregate is unclear). In *Moncada, supra,* 491 F.2d at 473, the presence of the vessel's managing and chartering agents in the United States was one of the factors that led the court to find substantial American contacts.

In the instant case, the claimants argue that Ta Chi authorized Ta Peng as operator to act on its behalf, and Ta Peng, in turn, appointed Transnational Maritime, Inc. ("Transnational") to act as its agent. On the record it appears that at the time of the accident Transnational was a New York corporation wholly owned by Byron P. Shaw, a naturalized American citizen, alleged stockholder in Ta Chi, and brother of a major stockholder in Ta Chi. Larsen Deposition at 9–10. The extent to which Transnational exercised control over the Eurypylus is unclear. Ta Chi states at one point that all instructions regarding the vessel emanated from Taipei, Answers to Interrogatories ¶ 14, and at another that Ta Chi authorized Ta Peng to perform "certain limited services on its behalf" and usually only with Ta Chi's authorization, *id.* ¶ 60. Elsewhere, Ta Chi states that it had issued no direct orders or instructions regarding the management, operation, control, or sailing destination of the Eurypylus. *Id.* ¶ 18. Ta Chi argues that this agency is clearly an insufficient basis for applying American law.[5]

---

5. Ta Chi cites *Manlugon v. A/S Facto,* 419 F.Supp. 550 (S.D.N.Y.1976) and *Merren v. A/S Borgestad,* 519 F.2d 82 (5th Cir. 1975) in support of its contention. On contacts that appear to be far less extensive than in the instant case, *Manlugon* decided that

> neither the mere use nor the mere ownership of such an agent in the United States by the

> shipowner suggests that the shipowner's base of operations is in the United States, and an extension of the base of operations doctrine to an enterprise whose link to the United States is this tenuous is not warranted.

*Supra,* 419 F.Supp. at 552. Whether the facts in this case will establish greater control ema-

Claimants rely, however, on the statement of Larsen, then vice-president of Transnational, that "[Transnational] had complete control of the Ta Peng Lines' vessels when they reached the Panama Canal. We appointed subagents throughout the Western Hemisphere on behalf of Ta Peng. We secured cargoes for the return voyage." Larsen Deposition at 5. Ta Chi acknowledges, *inter alia*, that Transnational had authority to appoint subagents in ports where a vessel under its authority called, Answers to Interrogatories ¶ 27, that Transnational acted as Ta Peng's agent for booking of cargo, *id.* ¶ 37, and that Transnational was authorized to act as steamship agent for Ta Peng in the western hemisphere, *id.* ¶ 61. Ta Chi further states that Byron Shaw, on whose alleged ownership interest in Ta Chi the claimants rely in urging the substantiality of the American contacts, had authority at the time of the accident to withdraw funds from Ta Peng's New York bank account. Answers to Interrogatories ¶ 59. *See also* note 4 *supra*. Ta Chi, through these agencies, clearly has contact with the United States. The determination whether this contact, alone or with the other American contacts, is substantial, however, must await elucidation of the kind and extent of control that these various entities exercised over the Eurypylus.

*Business of the Eurypylus*

Although the Supreme Court did not initially consider the regular trade of the vessel with the United States to be a factor to be weighed in the determination of Jones Act applicability, *Lauritzen, supra,* 345 U.S. at 581–82, 73 S.Ct. 921, the Court in a later opinion looked to the commerce of the vessel and its sister ships. *Rhoditis, supra,* 398 U.S. at 310, 90 S.Ct. 1731. This inquiry has also been pursued in the Second Circuit. *See Antypas, supra,* 541 F.2d at 309–10; *Moncada, supra,* 491 F.2d at 473; *Pavlou, supra,* 211 F.Supp. at 325. Ta Chi stated that approximately ten percent of its total income was derived from American business, Answers to Interrogatories ¶ 56, and that approximately twenty percent of Ta Peng's total income was derived from United States business, *id.* ¶ 57. The vice-president of Transnational suggested figures that may indicate even greater business with the United States, but the lack of clarity in the deposition on that subject precludes a definitive answer. Larsen Deposition at 14–15.

Ta Chi's business practice included advertising its vessels through trade journals in American ports, Answers to Interrogatories ¶ 30, advertising through Ta Peng, Larsen Deposition at 15, and by having its name appear at the offices of Transnational, Answers to Interrogatories ¶ 40. In short, Ta Chi appears to have carried on an active trade with the United States and done so by carrying on business activities within the United States, either directly or through an agent.[6]

*Other Factors*

■ The law is now clear that the place of the wrongful act, the allegiance of the injured seaman, the place shipboard articles are signed and any choice of law provisions contained in them, the inaccessibility of a foreign forum,[7] and the law of the forum

nating from the United States than was found in *Manlugon* is, along with the matter of other American contacts, an issue better addressed after the hearing.

In *Merren*, the Fifth Circuit affirmed a grant of summary judgment on the ground that plaintiffs had not shown substantial contacts with the United States; there the presence of shipping agents who contracted in American ports for the use of the ship's services was insufficient to render American law applicable. This *per curiam* opinion does not address, presumably because the court found it unnecessary to do so on the facts as there alleged, whether

control of a vessel from an American office would alter the result. In this largely factual decisional process, the Court finds *Merren* unhelpful.

6. For elaboration on those business practices, see agency discussion *supra*.

7. While the inaccessibility of a foreign forum is not at issue in this proceeding, it should be noted that Ta Chi argues that this forum should allow the claimants to recover only the amounts allegedly granted by the National Seamen's Board of the Republic of the Philippines. The gravamen of Ta Chi's argument appears to

are not factors of great importance. *Rhoditis, supra,* 398 U.S. at 310, 90 S.Ct. 1731; *Antypas, supra,* 541 F.2d at 310; *Moncada, supra,* 491 F.2d at 472–73 (and cases cited therein). Again, however, the decisional process is not one of weighing existing factors against absent ones, but rather one of determining whether the existing ones are substantial enough that American law may be applied to the transaction.

### Conclusion

■ Upon thorough study, the Court concludes that the record now before it is inadequate to determine whether the contacts between the transaction and the United States are substantial enough for American law to be applied to the instant claims. It is particularly important to clarify whether and to what extent Ta Chi was American-owned at the time of the accident and the extent to which the vessel was operated from the United States by Ta Chi either directly or through agents. Accordingly, the determination whether the Jones Act and United States general maritime law may be applied to these claims must be made after an evidentiary hearing to be scheduled by the Court in consultation with the parties.

So ordered.

be that the personal injury and death claims have already been decided or settled. The Court finds this proposition dubious in view of the Board's writing Ta Chi

> to take this opportunity of bringing to your attention of the apparent misrepresentations which you have committed against the National Seamen Board in not revealing to us the status of these cases; much that we want to make it clear that henceforth Ta Chi Navigation (Panama) Corp., S.A. shall be considered to be in the watch list of the blacklisted foreign shipping principals in the Philippines.

Letter from Oscar M. Torres, Chief of Legal Services of the National Seamen's Board of the Republic of the Philippines, to Ta Chi, dated June 5, 1978, attached as Exhibit A to Claimants' Third Memorandum in Support of Summary Judgment. The Court also notes, though without deciding, the claims that Ta Chi wrongfully pressured the claimants to accept settlement in the Philippines. *See* Affidavit of Richard J. Dodson, sworn to May 19, 1978, and attached affidavits of claimants.