**Amelia Zamora DeMATEOS, Administratrix of the Estate of Theodore Reyes, Deceased, Appellant,**

**v.**

**TEXACO, INC. and Texaco Panama, Inc.**

**No. 76–2313.**

United States Court of Appeals, Third Circuit.

Argued May 6, 1977.

Decided Aug. 12, 1977.

---

**9.** Uniform Contribution Among Tortfeasors Act, 12 P.S. §§ 2082, *et seq.*

Avram G. Adler, Adler, Barish, Daniels, Levin & Creskoff, Philadelphia, Pa., for appellant.

Linda W. Cannon, E. Alfred Smith, Krusen Evans and Byrne, Philadelphia, Pa., for appellees.

Before GIBBONS, MARIS and HUNTER, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

Amelia Zamora DeMateos, Administratrix of the Estate of her son, Theodore Reyes, a Panamanian seaman, appeals from an order of the District Court dismissing her suit against Texaco Panama, Inc. (Texpan), a Panamanian corporation, because the Eastern District of Pennsylvania is an inconvenient forum for the litigation. Her suit was brought under general maritime law, the Jones Act, 46 U.S.C. § 688 and the Death on the High Seas Act, 46 U.S.C. §§ 761 *et seq.* Reyes was a seaman aboard the S. S. Texaco Kenya, owned by Texpan, on a voyage between Honduras and Costa Rica when on February 18, 1970, he became ill. On arrival of the vessel at Puerto Limon, Costa Rica, on February 23rd he was transferred to a hospital where he died the following morning. His mother, the plaintiff, alleges that his death resulted from the failure of Texpan's agents in charge of its vessel to give him prompt and adequate medical attention. She charges both negligence and unseaworthiness, consisting of lack of proper medical facilities. She alleges, moreover, that the illness which resulted in her son's death was caused by an unseaworthy condition on the vessel which permitted him to inhale toxic fumes. We conclude that the District Court did not abuse its discretion in dismissing the complaint, and we affirm.

### I

The S. S. Texaco Kenya is a vessel of Liberian registry, owned by Texpan, a Panamanian corporation which has a principal place of business in Panama City. The corporation not only owns vessels but also engages in the business of marketing petroleum products in Panama. Reyes signed on as a crew member of the Texaco Kenya in March, 1969, in Panama, where he executed an employment contract incorporating standard "Conditions of Employment" which had been approved by the Labor Ministry of Panama for Panamanian seamen. Those conditions provide for the application of Panamanian law to disputes arising out of

Reyes' status as an employee. Prior to and during the voyage on which Reyes became ill, the Texaco Kenya was employed in short run voyages in the Caribbean, none of which was within the territorial waters of the United States. While Texpan owns the Texaco Kenya, the vessel is managed, pursuant to a ship management agreement, by Texaco Overseas Tankship Limited (TOT), a United Kingdom corporation with its principal place of business in London. TOT is engaged in international shipping. It is a wholly owned subsidiary of Texaco Limited, a United Kingdom corporation with its principal place of business in London. Texaco Limited, in turn, is wholly owned by Texas Operations (Europe) Ltd. (TOEL), a Delaware corporation. Texaco, Inc., a Delaware corporation the stock of which is listed on the New York, Midwest, London, Toronto, Basle, Geneva, and Zurich stock exchanges, owns all the stock of TOEL and of Texpan.

Following Reyes' death on September 16, 1971, Mrs. DeMateos and others instituted suit in the Third Labor Court of Panama against Texpan. Under Panamanian law, designated beneficiaries of a deceased seaman may recover from an employer for death caused by a "professional risk" to which the employee was exposed by reason of the work he performed for his employer. On August 16, 1972, the Third Labor Court rendered judgment for the plaintiffs. On appeal to the Superior Court of Panama the judgment was affirmed. Texpan then appealed to the Supreme Court of Justice of Panama, which reversed on June 6, 1973, holding that the plaintiffs had failed to carry the burden of establishing that Reyes' death was caused by a "professional risk". Texpan has at all times disputed the claim that Reyes' illness and death had anything to do with his service on the Texaco Kenya. The Panamanian law appears to be in the nature of a workmen's compensation statute imposing liability without fault for death arising from "professional risk," but imposing on the plaintiff the burden of establishing that the death arose out of an employment risk. The June 6, 1973, judgment of the Supreme Court of Justice of Panama in favor of Texpan is a final judgment of a sovereign state having in personam jurisdiction of the parties.

## II

Before the Third Labor Court of Panama rendered its decision, but while the case was pending before it, Mrs. DeMateos, on February 23, 1972, filed a complaint against Texaco, Inc. and Texpan in the Eastern District of Pennsylvania. Service of process was made in personam on Texaco, Inc., but not on Texpan. Texaco, Inc. moved for summary judgment, which was initially denied. No effort was made to serve Texpan in personam under Pennsylvania's long arm statute, 42 Pa. C.S.A. § 8301 *et seq.* and Fed.R.Civ.P. 4(e) and (i). However, in June of 1974, apparently following an attachment of a Texpan vessel other than the Texaco Kenya, pursuant to Pennsylvania's Foreign Attachment Rules, 42 Pa. R.C.P. No. 1251 *et seq.*, 42 Pa. C.S.A., the parties entered into a stipulation by virtue of which the action against Texaco, Inc. was dismissed with prejudice and counsel accepted service on behalf of Texpan "as if a vessel of [Texpan] had been legally attached in the Eastern District of Pennsylvania." That stipulation antedated this court's opinions in *Jonnet v. Dollar Savings Bank*, 530 F.2d 1123, 1130–1143 (3d Cir. 1976) and *U. S. Industries v. Gregg*, 540 F.2d 142 (3d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2972, 53 L.Ed.2d 1091 (1977), as well as the Supreme Court's endorsement in *Shaffer v. Heitner,* —— U.S. ——, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), of our view that quasi-in-rem jurisdiction to adjudicate is subject to the same due process limitations as is in personam jurisdiction. Thus the case against Texpan was before the court in the posture of an appearance, following a foreign attachment, with no objection made to the court's process.

After extended discovery, the parties submitted the case to the District Court as a case stated, consisting of the completed discovery and submission by counsel of certain undisputed facts, for the decision of

Texpan's contentions (1) that the Panama judgment in its favor should, under principles of international law, be afforded res judicata effect as a matter of comity, and (2) that even if that judgment was not dispositive, American maritime law was inapplicable to the transaction, and the case should be dismissed. The District Court, in a thorough and well-reasoned opinion, concluded that American maritime law should not apply and that the case should be dismissed in this inconvenient forum.[1] It did not reach the first issue tendered by Texpan because it concluded that the parties had not supplied it with sufficient information to make such a determination.

### III

■ The doctrine of forum non conveniens presupposes the existence of at least two forums in which the defendant is amenable to process. A stipulation made Texpan amenable to process in the Eastern District of Pennsylvania, while its incorporation and presence made it so amenable in Panama. If the two or more available forums are federal, 28 U.S.C. § 1404(a) mitigates the possible harshness of the forum non conveniens rule by providing for transfer rather than dismissal. But where the other available forums are non-federal—state or foreign—the traditional forum non conveniens remedy of dismissal is appropriate. *See generally 1 J. Moore, Federal Practice* ¶ 0.145[6.-1], p. 1635 n. 4 (1976) and cases there cited.

■ Texpan admits that vessels owned by it regularly called at ports in New Jersey, Pennsylvania, and Delaware. The Jones Act, 46 U.S.C. § 688, provides that in Jones Act cases

> [j]urisdiction . . . shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

Although § 688 uses the term "jurisdiction," it has been construed to be a venue statute. *Panama R. Co. v. Johnson*, 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924). It incorporates the venue provision of 28 U.S.C. § 1391(c) which allows suit against a corporation

> in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes.

*See Pure Oil Co. v. Suarez*, 384 U.S. 202, 204, 86 S.Ct. 1394, 16 L.Ed.2d 474 (1966). Thus the Eastern District of Pennsylvania was a permissible venue. However, in considering the propriety of a venue transfer pursuant to 28 U.S.C. § 1404(a), the Court has emphasized that such a transfer should not, despite its convenience, result in a change in the applicable law. *Van Dusen v. Barrack*, 376 U.S. 612, 626–43, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). That principle is no less applicable to a dismissal on forum non conveniens grounds.

■ The Jones Act, the Death on the High Seas Act, and American maritime law could be applied in the several federal forums in which Texpan could be sued, including the Eastern District of Pennsylvania. American law was not applied in Panama, and it seems clear that even if any forum now remains open in that jurisdiction it would apply its own rather than American law. The propriety of the forum non conveniens dismissal would seem to turn, then, on whether the District Court was correct in concluding that American law does not apply. The court recognized that the factors applicable to a forum non conveniens determination were set forth in the leading case of *Gulf Oil Co. v. Gilbert*, 330 U.S. 501, 507–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).[2] Among those factors, the Supreme Court observed,

1. *DeMateos v. Texaco Panama, Inc.*, 417 F.Supp. 411 (E.D.Pa.1976).

2. These include the private interests of the litigants, among them the relative ease and access to sources of proof; the availability of compulsory process to compel the attendance of unwilling witnesses; the cost of obtaining the attendance of witnesses; and the possibility of obtaining a view of the premises, when relevant. Also to be considered are issues of enforceability of judgments and possibility of a

[t]here is an appropriateness, too, in having the trial . . . in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.

330 U.S. at 509, 67 S.Ct. at 843.

Since application of the other *Gulf Oil Co. v. Gilbert* factors are not matters of dispute the District Court concentrated on this last.

## IV

■ The Jones Act and the Death on the High Seas Act are written in language so broad as to apply to any seaman on any vessel of any nation at any location on the globe. Obviously, however, the due process clause of the fifth amendment places bounds upon congressional efforts to apply American rules of decision to transactions in which the United States has no sufficient interest. In this respect, in the international arena, fifth amendment due process serves the same purpose as does fourteenth amendment due process with respect to the states. For this reason, as well as out of consideration of traditionally accepted notions of international law, these statutes have not been construed literally. Their reach, for our purposes, is found in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953) and *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 90 S.Ct. 17, 31, 26 L.Ed.2d 252 (1970). In the former, Justice Jackson considered the claim of a Danish seaman, temporarily resident in New York, who had signed articles in New York providing that rights of crew members of a ship of Danish registry would be governed by the law of Denmark. The seaman was injured in Cuban territorial waters. Notwithstanding two contacts with New York, temporary residence and place of contracting, the Court held that the Jones Act was inapplicable. The ·Court identified seven relevant choice of law factors:

1. The place of the wrongful act,
2. The law of the ship's flag,
3. The allegiance or domicile of the injured seaman,
4. The allegiance of the shipowner,
5. The place where the shipping articles were signed,
6. The inaccessibility of a foreign forum,
7. The law of the forum.

Of the seven factors discussed in *Lauritzen* the first six concededly point toward the inapplicability of American law to the instant death claim. As to the last, the law of the forum, Justice Jackson wrote:

We have held it a denial of due process of law when a state of the Union attempts to draw into control of its law otherwise foreign controversies, on slight connections, because it is a forum state. *Hartford Accident & Indemnity Co. v. Delta & Pine Land Co.*, 292 U.S. 143, 54 S.Ct. 634, 78 L.Ed. 1178; *Home Insurance Co. v. Dick*, 281 U.S. 397, 50 S.Ct. 338, 74 L.Ed. 926. The purpose of a conflict-of-laws doctrine is to assure that a case will be treated the same way under the appropriate law regardless of the fortuitous circumstances which often determine the forum. Jurisdiction of maritime cases in all countries is so wide and the nature of its subject matter so far-flung that there would be no justification for altering the law of a controversy just because local jurisdiction of the parties is obtainable.

345 U.S. at 590–91, 73 S.Ct. at 932.

As Judge Hunter recognized in *Henry v. Richardson-Merrell, Inc.*, 508 F.2d 28, 39 n. 25 (3d Cir. 1974), this was a clear acknowledgement that due process required the identification of significant American interests before an American sovereignty, state or federal, could export its law to foreign transactions, maritime or others. *Lauritzen* held that the American contacts of the seaman's temporary residence in New York, where the vessel called and where he signed on, was insufficient for the application of

---

fair trial. *Gulf Oil* acknowledges that forum non conveniens determinations also implicate public interests, such as the courts' caseloads, the unfairness of burdening citizens in an unre-

lated forum with jury duty, and the avoidance of creating difficult choice of laws problems which might result in a forum being required to apply a law unfamiliar to it.

American law to a Danish vessel and a Danish seaman for an injury outside our territorial waters.

If *Lauritzen* were the last word it would appear to be controlling. In *Hellenic Lines, Ltd. v. Rhoditis, supra*, however, the Court introduced a new factor. Justice Douglas, writing for the Court, considered the Jones Act claim of a Greek seaman, who signed on in Greece, on a vessel of Greek registry owned by a Panamanian corporation, with an employment contract providing for adjudication of claims arising out of the employment relationship in Greek Courts, for an injury in the Port of New Orleans. The vessel on which he served was managed by Hellenic Lines, Ltd., a Greek corporation 95% of the stock of which was owned by Pericles G. Callimanopoulos, a Greek citizen, but a permanent resident of the United States. Hellenic Lines, Ltd. maintained its largest office in New York and had another office in New Orleans. The vessel in question was managed by the New York office and derived its entire operating income from cargo originating or terminating in the United States. Expressly approving the opinion of Judge Medina in *Bartholomew v. Universe Tankships, Inc.*, 263 F.2d 437 (2d Cir. 1959), Justice Douglas, while acknowledging the significance of the seven factors listed in *Lauritzen*, said:

> [T]he shipowner's *base of operations* is another factor of importance in determining whether the Jones Act is applicable; and there well may be others.

> . . . . .

> We see no reason whatsoever to give the Jones Act a strained construction so that this alien owner, engaged in an extensive business operation in this country, may have an advantage over citizens engaged in the same business by allowing him to escape the obligations and responsibility of a Jones Act "employer."

398 U.S. at 309, 310, 90 S.Ct. at 1734. (Emphasis in original).

Perhaps as significant as what Justice Douglas wrote is what he quoted from Judge Medina's *Bartholomew* opinion:

> Thus each factor is to be 'weighed' and 'evaluated' only to the end that, after each factor has been given consideration, a rational and satisfactory conclusion may be arrived at on the question whether all the factors present add up to the necessary substantiality. Moreover, each factor, or contact, or group of facts must be tested in the light of *the underlying objective, which is to effectuate the liberal purposes of the Jones Act.*

263 F.2d at 441 (Emphasis supplied).

With deference both to Justice Douglas and to Judge Medina, it would seem that the underlying purpose for identifying and weighing factors is not to effectuate the liberal purposes of the Jones Act, but to determine whether within the limits of due process that Act could, and within the limits of the assumed congressional deference to the conventions of international law that Act should, be applied to the transaction in question. But while the *Rhoditis* opinion gives us less than complete illumination on the choice of law problem in international shipping, we do not understand it to be an abandonment of the fundamental teachings of *Lauritzen*—fundamentals that in the interstate context were recently reiterated by the Court in *Shaffer v. Heitner, supra*. As a leading commentator observed:

> Rhoditis (like Lauritzen) suffers from the customary weakness of any judicial decision. Just as Lauritzen, on its facts, had been almost the weakest possible case for the application of American law on any theory, so Rhoditis was the strongest possible case for its application on what may be called the 'base of operations' theory (assuming the 'base of operations' is in any way relevant, which the dissenting Justices denied). Not only had the beneficial owner been a resident of the United States for twenty years, conducting the affairs of his corporation from offices in this country, but the ship involved seems to have been employed exclusively in, and to have derived all its income from, trade with the United States. While a flat overruling of Rhoditis appears to be unlikely, extension of the base of operations doctrine to enterprises less clearly linked

to the United States appears to be equally unlikely.

G. Gilmore and C. Black, *The Law of Admiralty* 475 (2d ed. 1975).

 Here the Texaco Kenya was employed in transportation of petroleum between foreign nations. There is no evidence that it ever earned income from voyages to the United States. The vessel's base of operations, if it was not Panama, was London, where TOT performed the management services that in the *Rhoditis* case were performed by Mr. Callimanopoulos in New York. Thus even the "base of operations" factor on which Justice Douglas relied in distinguishing *Lauritzen* is inapplicable here. The place of the injury, the law of the ship's flag, the allegiance or domicile of the injured seaman, the allegiance of Texpan, the place where Reyes signed the shipping articles, the accessibility of a foreign forum to which Mrs. DeMateos actually resorted, and the base of operations of the vessel all point away from the application of American law. If we are to justify its application, it must be because, as Justice Douglas suggested in *Rhoditis*, there well may be other significant factors. The only one we are referred to, however, is the ownership by Texaco, Inc. of the stock of Texpan and through TOEL of the stock of TOT.

Mrs. DeMateos would have us hold that such ownership, alone, is sufficient. Texaco, Inc., though incorporated in Delaware, is in every sense a multinational corporate enterprise. Since its stock is listed on exchanges across the United States and Europe, and is traded, though unlisted, on the Cincinnati, Philadelphia, Baltimore, Washington, Boston, and Pacific exchanges as well, and since ownership of that stock is available to anyone, there is no indication in the record before us of the citizenship or domicile of its stockholders. We assume, however, that many are Americans. The District Court's findings of fact, which are not disputed, disclose that both Texpan and TOT are separate and solvent legal entities, with separate boards of directors, maintaining separate books of account. Texpan, in particular, has an extensive business in Panama in the sale of petroleum products both retail and wholesale. It would be an extreme suggestion, we think, that American law could govern relations between Texpan and the employees in its Panamanian gasoline stations because its stock was owned by a multinational business enterprise incorporated in Delaware. It is no less extreme to suggest that American law should govern the relations between Texpan and its employees on vessels it uses in the transportation of petroleum between Central American countries. Either suggestion is a variety of social jingoism, which presumes that the "liberal purposes" of American law must be exported to wherever our multinational corporations are permitted to do business. Some of our laws, to other nations, may not appear as liberal as the Jones Act appears to us, and extreme applications of such an effort might well result in those nations closing their door to such corporations, to their and our competitive disadvantage. Even if we assume that Texaco, Inc.'s ownership of the stock of Texpan is a sufficient American contact to justify, for due process purposes, the application of American law to Texpan's Panamanian employees (a dubious assumption), we do not think Congress, in enacting the Jones Act and the Death on the High Seas Act, intended that result. *Cf. Windward Shipping (London) Ltd. v. American Radio Ass'n*, 415 U.S. 104, 112–13, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974).[3] Thus we conclude that

---

**3.** We note that federal courts in the Second Circuit have taken an expansive view on the question of the export of American maritime law, viewing American stock ownership in a ship owning corporation as sufficient to justify the extraterritorial application of the Jones Act. *See, e. g., Antypas v. Cia. Maritime San Basilio, S.A.,* 541 F.2d 307, 310 (2d Cir. 1976); *Moncada v. Lemuria Shipping Corp.,* 491 F.2d 470, 473 (2d Cir.), *cert. denied sub nom., Ekberg Shipping Corp. v. Moncada,* 417 U.S. 947, 94 S.Ct. 3072, 41 L.Ed.2d 667 (1974); *Rainbow Line, Inc. v. M/V Tequila,* 480 F.2d 1024, 1027 (2d Cir. 1973); *Bartholomew v. Universe Tankships, supra,* 263 F.2d at 443 n. 4; *Fitzgerald v. Angela Compania Naviera, S.A.,* 417 F.Supp. 151 (S.D.N.Y.1976); *Bobolakis v. Cia. Panamena Maritima, San Gerassimo,* 168 F.Supp. 236

the District Court, recognizing that American Law would not apply, was justified in dismissing the complaint because the Eastern District of Pennsylvania is an inappropriate forum.

The judgment of the district court will be affirmed.

(S.D.N.Y.1958). For the reasons stated above, we decline to take so broad a view of the reach of the Jones Act. Moreover, the Second Circuit, in *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448 (2d Cir. 1975), *cert. denied*, 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976) affirmed a forum non conveniens dismissal of plaintiff's collision action against Texpan, the same party presently before us. Although Judge Oakes' dissent stressed the ownership of Texpan's stock by Texaco, Inc., which has offices in New York, the Second Circuit refused to find such ownership controlling. Such a decision, from the Circuit which has put heavy emphasis on the factor of stock ownership in other cases, reinforces our conclusion that the district court's dismissal on forum non conveniens grounds in this case was not an abuse of discretion.