**Pablo MEMBREÑO, Plaintiff,**

v.

**COSTA CROCIERE, S.p.A., a foreign corp., and CSCS International N.V., a foreign corp., Defendants.**

**No. 03–61180–CIV–HUCK.**

United States District Court, S.D. Florida.

Nov. 23, 2004.

Michael Frederick Guilford, Guilford & Rash, Miami, FL, for Plaintiff.

David James Horr, Stephanie Hurst Wylie, Horr Novak & Skipp, Miami, FL, for Defendants.

## *ORDER ON DEFENDANTS' MOTION TO DISMISS*

HUCK, District Judge.

THIS MATTER is before the Court on the Defendants' Motion to Dismiss Based Upon *Forum Non Conveniens,* filed October 20, 2003 [DE # 23]. The Court has considered the Motion, the Response, and the Reply, as well as supplemental memoranda, case authorities, and evidentiary submissions from both sides. Upon consideration, the Court finds as follows.

### Factual Background and Procedural History

Plaintiff Pablo Membreno filed a Complaint on June 18, 2003, alleging five-counts under the Jones Act and general maritime law against four defendants related to a personal injury that he alleges occurred while he was working on a cruise ship. After preliminary motions to dismiss, the parties stipulated to dismissal of two of the defendants, further stipulating that Cruise Ships Catering & Service International, N.V. ("CSCS"), was Membreno's employer and Costa Crociere, S.p.A. "(Costa"), was the owner of the ships upon which be worked. The Court then granted summary judgment on Counts II and V as to CSCS and extended the time for further response to Defendants' Motion for Summary Judgment on Counts I, III, and IV as to Costa. The Court also set a briefing and discovery schedule as to Defendants' Motion to Dismiss Based Upon *Forum Non Conveniens,* which was filed on October 20, 2003. On March 31, 2004, upon the Defendants' Motion, the Court entered an Order staying the case pending the Eleventh Circuit's ruling on appeals of three cases involving this same issue and these same Defendants. The Eleventh Circuit issued its ruling on the consolidated appeal of the last two of these cases on September 16, 2004. *See Baurista v. CSCS Int'l, N.V.,* No. 04–10335, slip op. at 3 (11th Cir. Sept. 16, 2004) (unpublished). Upon notification of this ruling, the Court lifted the stay and ordered a response and reply to the Motion to Dismiss, which were filed on November 1 and November 16, 2004. This Motion is now ripe for consideration.

Membreno, a Honduran citizen and resident, entered an employment contract as an oiler with CSCS for the period from June 12, 2000, to January 28, 2001, aboard the *Costa Atlantica,* and entered another employment contract with the same com-

pany on the *Costa Victoria* from March 4, 2001, to September 17, 2001. CSCS is a Netherlands Antilles company whose only land-based office is in Curacao, Netherlands Antilles. Both the Costa *Atlantica* and *Costa Victoria* are owned by Costa, an Italian corporation headquartered in Italy and with no offices or employees in the United States. Both ships are Italian flagged vessels with their Port of Registry in Genoa, Italy, and both ships' officers and medical personnel during the relevant periods were French and Italian citizens. Since September 2000, through an intermediary Italian holding company, Costa has been a fully owned subsidiary of Carnival Corporation, a Panamanian corporation with its principal place of business in Miami, Florida.

Membreno first boarded the *Costa Atlantica* in Helsinki, Finland, on June 12, 2000. Plaintiff alleges that, on January 23, 2001, while the *Costa Atlantica* was at sea engaged in a seven-day Caribbean cruise beginning and ending in Fort Lauderdale, Florida, he injured his right wrist due to the closing of a smokestack door. He disembarked the ship five days later, at the end of his contract, and was flown to his home in Honduras. Membreno alleges that he reported his injury to his supervisor and to the ship's doctor, but that he did not receive prompt medical attention either on the ship or after he was flown home to Honduras. In March, 2001, Membreno traveled back to Fort Lauderdale and began his service on the *Costa Victoria* under a new employment contract. He alleges that he complained to the ship's physician that he had not received any medical treatment in Honduras and that he was still experiencing difficulty with his wrist. In September 2001, the *Costa Victoria* was calling at ports in the Mediterranean Sea, and, on August 14, 2001, Membreno received medical attention for his wrist in Barcelona, Spain. On September

12, 2001, he returned to the ship's infirmary and then received a second opinion from another physician in Barcelona on September 14, 2001. On September 16, 2001, the ship's physician referred Membreno for medical treatment at a shore-side facility in Genoa, Italy. On September 17, 2001, he disembarked the *Costa Victoria* in Naples, Italy, and was flown home to Honduras by his employer for medical treatment at the Clinica Murrillo in San Pedro Sula, Honduras. Dr. Francisco Murrillo diagnosed Membreno with Kienbock's disease of his right wrist and recommended surgery. Membreno requested a second opinion, and, although Defendants offered him a second opinion from Dr. Jorge Osejo, a Honduran doctor, Membreno elected to travel to Miami on April 12, 2002, to be seen by Dr. Jay Dennis, an orthopedic surgeon and wrist and elbow specialist. On May 14, 2002, Dr. Dennis performed surgery on Membreno's wrist. On October 16, 2002, Membreno returned to Honduras and underwent additional physical therapy.

The parties have submitted evidence relevant to CSCS and Costa's connections to the United States and to Florida. Specifically, Membreno has submitted evidence regarding Costa's ownership of a subsidiary company headquartered in Florida and its business relationship with other U.S. companies, evidence that Carnival Corporation owns 100% of Costa's stock, and evidence that Costa has entered into contracts with Carnival for certain services, including operation of shipboard casinos and provision of food and beverage products, hotel supplies, and fuel. Defendants have presented evidence that the day-to-day operations of the *Costa Atlantica* and *Costa Victoria* are controlled from Costa's Italian headquarters, which employs over 450 employees, and that the contracts with Carnival are arms-length

transactions that are necessitated by the separate corporate structures. These factual issues will be discussed in greater detail below.

### Analysis

■ Plaintiff brought this suit under the Jones Act, which imposes liability on a shipowner for negligent acts at sea, and under general maritime principles that impose liability on a seaman's employer for injuries suffered by an employee during his service. The first step in determining whether *forum non conveniens* dismissal is appropriate is to determine whether United States or foreign law should be applied. If United States law applies, the case should not be dismissed for *forum non conveniens*. *Szumlicz v. Norwegian America Line, Inc.*, 698 F.2d 1192, 1195 (11th Cir.1983). If foreign law applies, a court must examine the traditional considerations of *forum non conveniens* in determining whether dismissal is appropriate. *Id.* Although application of foreign law does not *require* dismissal, "the need to resolve and apply foreign law should 'point [the trial court] towards dismissal.'" *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1519 (11th Cir.1985).

■ The Supreme Court has set out a non-exhaustive list of eight factors that should be considered in determining whether the Jones Act or the general maritime law of the United States applies to a particular set of facts. The first seven factors established in *Lauritzen v. Larsen*, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), are: (1) the place of the wrongful act, (2) the law of the flag, (3) the allegiance or domicile of the injured, (4) the allegiance of the defendant shipowner, (5) the place of the contract, (6) the inaccessibility of a foreign forum, and (7) the law of the forum. *See Szumlicz*, 698 F.2d at 1195. The Supreme Court added an eighth important factor in *Hellenic Lines*

*v. Rhoditis*: the shipowners "base of operations," noting that "if . . . the liberal purposes of the Jones Act are to be effectuated, the facade of the operation must be considered minor, compared with the real nature of the operation and a cold objective look at the actual operational contacts that this ship and this owner have with the United States." 398 U.S. 306, 309–10, 90 S.Ct. 1731, 26 L.Ed.2d 252 (1970); *see also Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 384, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959) (holding that the Jones Act choice of law analysis should be applied to general maritime law).

■ This case is similar to several other cases brought by foreign plaintiffs against these foreign corporations in the Southern District of Florida and in state court in Miami–Dade county. Although Judge Gold in this District found that a case involving similar facts was properly brought here, *see Williams v. Cruise Ships Catering & Serv. Int'l, N.V.* ("CSCS Int'l, N.V."), No. 03–60158–CIV (S.D.Fla. Dec. 9, 2003), the majority of judges have dismissed the cases on the grounds of *forum non conveniens. See, e.g., Melbourne v. CSCS Int'l, N.V.*, No. 03–62200–CIV (S.D.Fla. Oct. 5, 2004); *Hernandez v. CSCS Int'l, N.V.*, No. 03–20302–CIV (S.D.Fla. Dec. 8, 2003); *Bautista v. CSCS Int'l, N.V.*, No. 03–60160–CIV (S.D.Fla. Nov. 13, 2003); *Rodriguez v. CSCS Int'l, N V.*, No. 03–60288–CIV (S.D.Fla. Nov. 13, 2003). Two of these dismissals, *Bautista* and *Rodriguez*, were appealed to the Eleventh Circuit. While its opinion on the consolidated appeal of these two cases is unpublished, the Eleventh Circuit reviewed *de novo* for clear error the district court's finding that United States law did not apply and "conclude[d] that the district court correctly determined that United States law does not apply to the plaintiffs' claims," further finding that dismissing the

case on *forum non conveniens* grounds was not an abuse of discretion. *Bautista v. CSCS Int'l, N.V.*, No. 04–10335, slip op. at 3 (11th Cir. Sept.16, 2004) (unpublished). Membreno, however, argues that this Eleventh Circuit case is unpersuasive, that Judge Gold's order was based on a consideration of more evidence, and that there are additional connections to the United States in this case than in the previous cases that were dismissed for *forum non conveniens*.[1] For the following reasons, the Court disagrees with Membreno and joins the majority of courts in finding that dismissal is appropriate in this case.

There appears to be no real disagreement that six of the eight choice of law factors weigh in favor of the Defendants' contention that the Jones Act and United States maritime law do not apply. Both

vessels involved in this action were Italian flagged ships, Membreno lives in and is a citizen of Honduras, the shipowner is an Italian corporation, the place of contract was apparently not the United States, alternative fora are available in Italy, Honduras, or the Netherlands Antilles,[2] and a comparison of law of the available fora is not a significant issue. Rather, Membreno appears to argue that the remaining two factors weigh sufficiently in favor of applying United States law that this Court should retain jurisdiction. As to the place of the accident, Membreno concedes that the injury occurred at sea, but suggests a connection to the United States because the *Costa Atlantica* was engaged in seven-day cruises beginning and ending in Fort Lauderdale, Florida, at the time of the accident.[3] *See Hernandez*, Order at 2 (dismissing case for *forum non conveniens*

---

1. Unpublished orders from the Eleventh Circuit are non-precedential but can be cited for their persuasive authority. Although Membreno disputes the persuasiveness of this opinion, arguing that more evidence of Costa's connections to the United States has been presented to this Court, the Defendants have shown that most of the same arguments and evidence presented in opposition to this Motion were available to the Eleventh Circuit. The Court thus finds that opinion and the reasoning set out by the district court in the underlying orders to be particularly persuasive.

2. Membreno does not dispute the availability of alternative fora in his response, and Defendants have waived any available time-bar defenses and have consented to personal jurisdiction in these fora. Additionally, Defendants have filed affidavits from lawyers in Honduras, Italy, and the Netherlands Antilles testifying to the adequacy of the remedies available in those countries. Membreno moved to strike those affidavits because they were filed after the reply motion, arguing that they should have been filed at the time the motion was filed so that he could have had an opportunity to respond to them and conduct discovery. However, the Court does not rely heavily on those affidavits, but, rather, relies on Defendants' consent to jurisdic-

tion and waiver of time-bar defenses and on the findings of other judges in very similar cases filed in this District that Italy, Honduras, and the Netherlands Antilles provide adequate, alternative fora. *See, e.g., Rodriguez*, No. 03–60288–CIV, Final Judgment at 4; *Hernandez*, 03–20302–CIV, Order at 6. Moreover, the Court is dismissing this case without prejudice so that it can be refiled if an adequate alternative is not available.

3. Defendants allege that there is no evidence that the injury occurred while on-board the *Costa Atlantica* and suggest that Membreno has merely included this allegation to involve a ship that has more connection to the United States than the *Costa Victoria*, the ship on which his injury was first treated. While the Court shares the Defendants' concern regarding this allegation given that the first documentation of the injury is on August 14, 2001, nearly eight months after Membreno alleges it first occurred, the Court nonetheless takes this allegation as true for the purposes of this motion to dismiss. Nonetheless, the majority of the witnesses and evidence in this case would arise from Membreno's service on the *Costa Victoria*, a ship that he admits "seldom called in the United States."

where a seaman was injured at sea on the *Costa Victoria*, despite the fact that he received minor medical attention in Fort Lauderdale when the ship docked there). The Court does not find this to be a significant connection to the United States since the accident did not occur within the United States or the territorial waters of the United States.

Therefore, the remaining significant question is whether the Defendants' "base of operations" is located in the United States or whether the Defendants otherwise have sufficient contacts with the United States to warrant the application of United States law. Some Courts have found that this "base of operations" factor alone can provide adequate grounds for applying the Jones Act or general United States maritime law. *See, e.g., Szumlicz,* 698 F.2d at 1195 (finding that substantial use of a United States base of operations justified application of United States law); *Williams,* No. 03–60158–CIV, Order at 11; *Mattes v. Nat'l Hellenic Am. Line, S.A.,* 427 F.Supp. 619, 623 (S.D.N.Y.1977) (citing another case where "the fact that the shipowning corporation was wholly owned by American stockholders was alone a sufficient contact"). *But see Warn v. M/Y Maridome,* 169 F.3d 625, 628–29 (9th Cir. 1999) (holding that the base of operations factor alone does not warrant a choice of United States law and finding that the only factor that, alone, could be dispositive is the law of the flag). In the cases cited above, other courts in the Southern District of Florida have addressed the specific question of whether the "base of operations" of these same Defendants is in the United States, and, with one exception, have found that it is not.

Membreno relies heavily on that exception—Judge Gold's order denying dismissal upon his finding that the United States is the Defendants' base of operations be-

cause "the ship's and the shipowner's operational ties are significant based upon substantial contacts with the United States." *Williams,* Order at 11. Judge Gold's view that the operational contacts were sufficiently significant to warrant exercise of jurisdiction required looking "beyond corporate formalities." *Id.* In his original order denying dismissal, Judge Gold found that Carnival Corporation's stock ownership of Costa, Costa's ships' use of United States ports for some of its cruises, and Costa's marketing of cruises to United States customers through a subsidiary corporation provided the substantial contacts that justified retention of jurisdiction. In that order and in a subsequent order denying reconsideration, Judge Gold pointed to other evidence that "Carnival ... has a significant influence over Costa's financial and operating policies and conducts its daily business operations in Miami, Florida," to bolster his finding that "[t]hrough Carnival, the Costa corporations are substantially related to the United States." *Id.* at 19; *see also Williams,* Reconsideration Order at 6 (S.D.Fla. Mar. 31, 2004). That additional evidence included statements in Carnival's 10–K and 10–Q filings with the SEC, some contracts between Costa and Carnival for the provision of certain services and goods, loans and other assistance by Carnival to Costa, and Costa's business contacts in the United States through U.S. corporations. *See Williams,* Order at 17–18; Reconsideration Order at 5–23.

This Court, having evaluated the same evidence as Judge Gold, disagrees with his conclusion as to the substantiality of Costa's contacts with the United States and finds that Costa's base of operations is Italy, not the United States. While Carnival certainly has its base of operations in the United States, the evidence presented supports that Carnival does not control Costa's day-to-day operations, and Membreno's argument that Carnival does exer-

cise such control puts too little emphasis on the corporations' maintenance of corporate formalities. As a state court found in a case involving this same Defendant, while "beneficial ownership of Costa Crociere, S.p.A is ultimately in the hands of Carnival Corporation," "Carnival Corporation operates its business separately and independently from Costa Crociere," and, therefore, "Carnival's ownership of Costa's stock does not impact the *forum non conveniens* analysis." *See Valdivia v. Prestige Cruises*, No. 02–14714, Order at 2 (Fla. 17th Cir.Ct. Apr. 14, 2004). Although Membreno cites some cases where stock ownership by individuals who were citizens of or resided in the United States helped establish jurisdiction, in those cases, the individuals were direct beneficial owners of the stock and the companies' only corporate offices were located in the United States. *See Fantome S.A. v. Frederick*, No. 02–10890, slip op. (11th Cir. Jan. 24, 2003) (unpublished) (denying dismissal because, with respect to a corporation with a majority stockholder living in Miami Beach and which had no foreign corporate headquarters, "[e]very decision that was not made on the ship appears to have been made at the Miami Beach headquarters."); *Fisher v. Agios Nicolaos V*, 628 F.2d 308, 317 (5th Cir.1980) (finding that the entire business activities of the ship were in the United States); *see also Mattes*, 427 F.Supp. at 623 (noting that cases which state that American stock ownership alone is sufficient to justify application of the Jones Act did not rest on that point but

relied on other substantial United States contacts, as well). Moreover, rather than being owned directly by stockholders in the United States, Costa is owned by a multinational corporation incorporated in Panama and with its principal place of business in the United States. *See DeMateos v. Texaco, Inc.*, 562 F.2d 895, 902 (3d Cir.1977) (holding that stock ownership by a multinational corporation incorporated in the United States was insufficient to expose the defendant to Jones Act liability).

■ Further, the Court agrees with Defendants that determining whether Carnival is actually controlling the operations of Costa's Italian headquarters requires an analysis akin to piercing the corporate veil, and where, as here, entities have "carefully structured their corporate relationships and maintained each entity's separate corporate existence," the activities of the subsidiary cannot be imputed to the principal. *Sun Trust Bank v. Sun Int'l Hotels Ltd.*, 184 F.Supp.2d 1246, 1268 (S.D.Fla.2001).[4] Here, it appears that Costa's day-to-day operations are all run from its 450–person Italian office, there is no evidence of direct involvement by managers and officers at Carnival in the daily decisions of the Costa cruise line. *See Hernandez*, Order at 5 (finding that "[o]ther than making infrequent stops in Florida, it appears that every decision regarding the *Victoria*'s daily operations, such as the vessel's itineraries, repairs, inspection, supervision, and voyages take place outside the United States").[5]

4. In fact, in a prior ruling in this case, the Court responded to an effort by Membreno to pierce the corporate veil in order to have this Court find that Carnival was the actual owner of the Costa ships by stating that, in order to do so, he would have to "file additional evidence to satisfy his burden ... of proving that the corporate structure is an artifice or a sham." Nothing filed by Membreno since

that time has convinced the Court that the corporate structure is an artifice or sham. Rather, the evidence filed by both parties demonstrates that Costa and Carnival have strictly maintained separate corporate identities.

5. As it is only one of seventy-three "subsidiaries" of Carnival, including other leading cruise lines such as Cunard Line Ltd., Hol-

The Court also rejects Membreno's argument that Costa's contracts with Carnival for provision of certain goods and services demonstrate that Carnival was, in actuality, in control of the day-to-day operations. Defendants have shown that these are arms-length contracts that were negotiated between the two separate corporate entities, that the corporate distinctions were maintained throughout each of the contracts, and that, if Carnival actually were in control of Costa's day-to-day operations, these contracts would not be necessary. For example, the procurement contract was negotiated with Carnival so that Costa could take advantage of bulk discounts through Carnival's greater purchasing power. However, the contract gives Costa great discretion in whether to procure their supplies from Carnival or another vendor, requires Costa to pay invoices for all supplies purchased from Carnival and to pay a fee for use of the procurement services, and designates an Italian court as the forum for any contract disputes. The casino operating agreement is similarly a service for which Costa is invoiced by Carnival. Costa has also taken advantage of Carnival's expertise in shipbuilding to contract for technical advice in its building of a new vessel, just as it had contracted with another corporation for that service in the past, and neither of the ships involved in this action was built with any assistance from Carnival. Thus, the Court finds that Costa's contracts with Carnival do not indicate operational control, but rather involve arms-length contracts which, although Carnival may have had an advantage in procuring due to the corporate connection, would have to be negotiated with other companies if not with Carnival. The corporate distinctions have been maintained and control over Costa's operations clearly resides in its Italian corporate headquarters.[6]

As to Costa's own operations in the United States, while it is indisputable that Costa markets its cruises and has some customers in the United States, the great majority of its business—about 80 to 85% of it—comes from just its European market, with no more than about 7% of its passengers and 4% of its worldwide net revenues coming from the sale of cruises in the United States and the majority of its remaining sales coming from South American and Caribbean countries. *Cf. Hernandez,* Order at 5 (noting the undisputed fact that 93% of Costa's passengers and 96.5% of its annual revenues come from operational activities outside the United States). Similarly, only a small percentage of Costa's cruises originate from or call at United States ports. During the relevant period, just two of Costa's nine ships stopped at ports of call in the United States, and then for only about four months out of the year, with the entire fleet spending only 3.4% of its sailing days in United States ports. While Membreno also points to local contacts at these United States ports as further evidence of a substantial connection to the United States, Defendants point out that the fleet must comply with governmental

land America Line, Windstar Ltd., and P & O Cruises, it is difficult to imagine that Carnival's corporate office in Miami would have the ability to manage the day-to-day operations of Costa's cruise ships. Costa, in fact, must pay a fee for participating in the Carnival alliance, which is marketed as "the World's Leading Cruise Lines."

6. Although, Membreno contends that these and other facts, such as loans from Carnival to Costa, provide support for his argument that Costa had a base of operations in Florida through Carnival, this Court disagrees with that assessment and, rather, sees the need for formal contracts and loans as an indication that the corporations are operationally separate.

regulations at each port of call. In the United States, it accomplishes such compliance by posting the bonds required to obtain a Certificate of Responsibility, by following an environmental compliance plan negotiated between Carnival and the United States government for all cruise lines in the Carnival alliance, and by contracting with local businesses for assistance with waste removal, food and beverage provisioning, and dock piloting and tugboat assistance. These local contacts and contracts, undertaken to comply with governmental regulations at each port of call and which are orchestrated from Costa's Italian headquarters, are again insufficient to create the substantial contacts required by the Jones Act. Were it otherwise, any cruise line that ever called on a port in the United States would be subject to United States law.

Membreno also points to Costa's ownership of a United States subsidiary, Costa Cruise Lines, N.V. ("CCL"), and Costa's business relationship with International Risk Services, Inc. ("IRSI"), as evidence of a more significant connection to the United States.[7] First, CCL is just one of eight separate companies worldwide which markets and sells passenger tickets on Costa vessels, and CCL's territory is not limited to the United States, but also includes Venezuela, Canada. Mexico, Costa Rica, Honduras, Nicaragua, Panama, and the Caribbean.[8] Moreover, Florida state courts addressing this issue have held that "Costa Cruise Lines' presence in Florida is

of no moment as the substantive liability does not involve that entity." *CSCS Int'l, N.V. v. Tananta*, 823 So.2d 258, 260 (Fla. 3d DCA 2002); *Calvo v. Sol Melia, S.A.*, 761 So.2d 461, 464 (Fla. 3d DCA 2000) ("The presence in Florida of corporate subsidiaries whose conduct is unrelated to the claim is not relevant."). IRSI, on the other hand, is merely a consultant company that contracts with Costa to provide claim handling services for Costa's non-European employees. All other personnel matters related to CSCS are handled by the corporation itself, by Stabile Organizzazione in Italy, or by contacts in Monaco, and all employee personnel files are maintained in Monaco. A copy of a crew member's file is sent to IRSI only if that employee makes a medical claim. Further, Costa is not IRSI's only client, as it contracts for claim administration services with other companies, including Sunderland Marine, Royal Caribbean, Silver Seas, and other ship operators. In short, Costa's limited commercial activities in the United States and its business affiliation with two United States companies for purposes that are, at best, ancillary to Membreno's employment are not sufficiently substantial connections to justify application of the United States law in this case. *See Bautista*, Order at 5–6 ("In today's climate of worldwide economies and the internet, there are few companies that have no connection with the United States. However, such a connection alone is insuf-

---

7. Membreno has also provided evidence regarding Defendants' ownership of a foreign corporation, CSCS Caribbean, N.V., which was authorized to do business in the United States and which was allegedly involved in Costa's payments of maintenance and cure, but he has shown no connection between that corporation and this case. He further concedes that the corporation ceased doing business in 1999 and issued its last payments in January, 2001, well before Defendants started

making maintenance and cure payments in this case in September, 2001.

8. Although Membreno has reported sales figures for CCL that appear to be larger than the revenues that Defendants report Costa collects from the United States market reported, Defendants note that the figures given by Membreno represent the total number of passenger tickets sold in and sales revenues for all of the countries served by CCL.

ficient to justify the United States' becoming the court for all tort disputes in the world.").[9]

Membreno argues that an additional factor that this Court should consider in this case is that he ultimately was treated in and had surgery performed in the United States. However, that fact is unrelated to Costa's contacts with the United States. Costa arranged for Membreno's medical care in Honduras and set-up an appointment for a second opinion with another Honduran specialist. However, Membreno elected, on his own, to return to the United States to seek a second opinion from an orthopedic specialist and, when that doctor agreed with the Honduran doctor's assessment that surgery was necessary, Membreno elected to have that South Florida doctor perform the surgery. This is thus distinguishable from cases where an employee's care in the United States was arranged by the employer. *See Tananta*, 823 So.2d at 259 n. 1 (finding that, where an injured seaman whose initial medical care was administered in other countries but where the seaman ultimately had back surgery in Florida, the "Florida medical treatment is not at issue"); *Calvo*, 761 So.2d at 463–64 (holding that "the availability of medical facilities in South Florida to injured parties in the Caribbean should not open Florida courts to litigation.").

Having determined that the Jones Act and general United States maritime law do not apply, the Court must determine whether dismissal on *forum non conveniens* grounds is appropriate under the facts of this case. Under the traditional *forum non conveniens* doctrine, "the mov-

ing party must demonstrate that (1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1310–11 (11th Cir.2001). Determining the private interests requires determining the convenience of the parties, and, while domestic plaintiffs are entitled to a strong presumption that the chosen forum is convenient, "when the plaintiff is foreign, this assumption is much less reasonable." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Leon*, 251 F.3d at 1311. The Eleventh Circuit has instructed that courts should consider the public and private factors in all cases, even though private factors are generally considered more important. *Leon*, 251 F.3d at 1311.

As noted above, the Court finds that the first and third elements of the test are satisfied, since adequate alternative fora are available in Honduras, the Netherlands Antilles, and Italy. Since the Defendants have waived jurisdictional and time-bar defenses in those fora, it should be possible for Membreno to reinstate his action in one of those countries without undue inconvenience or prejudice. The private factors, except for the presence of Membreno's surgical physician in South Florida, all weigh in favor of dismissal, since (1) Membreno is not a United States citizen, (2) no other United States citizen or Florida resident is likely to be a witness in this action and the majority of witnesses, medical records, and other documentary evidence are located in Italy, Spain, Monaco, and Honduras, (3) a judgment would be enforceable

---

9. The Court finds that Membreno's arguments regarding forum selection clauses in contracts with passengers and insurance and bonds obtained for passenger claims have little, if any, bearing on the Jones Act liability and general

maritime liability of Defendants to this employee. In addition, the location of surveys and inspections by the Italian organization that regulates Costa's ship is irrelevant to the *forum non conveniens* analysis.

in another country, and (4) the "practicalities and expense" of the litigation, such as the availability of compulsory process and the convenience of the forum, favor an alternative forum. *See Tananta,* 823 So.2d at 259 ("The record reveals that the majority of the relevant documentary evidence and witnesses are located or accessible in Peru or the Netherlands Antilles; the only evidence here is of Tananta's surgery and his claim file at International risk."). The public factors also weigh in favor of dismissal since, "as no significant connection exists between the parties, this case, and the United States, no local interest exists that would justify empaneling a jury in this district to decide the case." *Hernandez,* Order at 7; *see also Tananta,* 823 So.2d at 259 ("Florida has no interest in an accident which occurred onboard a ship off the coast of Argentina to a Peruvian citizen while he was working for a foreign corporation on a ship owned and operated by foreign corporations with no offices in Florida even though he has received some medical treatment in Florida."); *Sigalas,* 776 F.2d at 1519 ("[H]earing cases that have no interest to the United States would exacerbate docket congestion, would impose costs on the community in terms of judicial resources and jury duty, would foster the need to 'untangle problems of conflicts of laws' and to decides cases 'in law foreign' to the court, and would conflict with the general interest in having localized interest decided at home."). As Judge Dimitrouleas put it, "[i]n this case, the major connection to the United States is the law practice of Plaintiff's attorney." *See Bautista,* Order at 6 (further stating that "[t]he habitual generosity of American juries is not a reason to try the case here"). In contrast, any of the three countries in which there are alternative fora, particularly Honduras and Italy, have a much greater public interest in exercising jurisdiction to protect the interests of their citizens, corporations, and flagged vessels. The Court thus finds that all of the *forum non conveniens* factors weigh in favor of dismissing this action here and allowing it to be heard in a more convenient and appropriate forum.

### Conclusion

For the foregoing reasons, the Court finds that the Jones Act and the general maritime law of the United States do not apply in this case and that the private and public factors weigh in favor of this case being tried in one of the three countries, Italy, Honduras, or the Netherlands Antilles, with a greater interest in this action and where there are available and adequate fora. Accordingly, it is

ORDERED that Defendants' Motion to Dismiss Based Upon *Forum Non Conveniens* is GRANTED, and this case is DISMISSED without prejudice to Membreno's ability to refile this action in an alternative forum or to reinstate his action in this Court if no alternative fora accepts his case. All pending Motions are denied as moot, and the Clerk is directed to CLOSE this case.